Exhibit A



May 28, 2015

MEMORANDUM FOR:     Sarah Saldaña
                    Director
                    U.S. Immigration and Customs Enforcement

                    Gwendolyn Keyes Fleming
                    Principal Legal Advisor
                    U.S. Immigration and Customs Enforcement

FROM:               Megan H. Mack
                    Officer
                    Office for Civil Rights and Civil Liberties

                    David J. Palmer
                    Acting Associate General Counsel (Legal Counsel)
                    Office of General Counsel

SUBJECT:            Recommendations Regarding Ongoing Issues and Open
                    Complaints at the Etowah County Jail[1]

The U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties
(CRCL) has consistently received a large number of complaints from detainees at the Etowah
County Jail (ECJ) alleging that U.S. Immigration and Customs Enforcement (ICE) has violated
individuals' civil rights and civil liberties.  CRCL conducted three on site investigations at the
facility in 2006, 2008, and 2012.  Based on the results of our investigations, we made numerous
recommendations to ICE for changes at the facility.  Our most recent memorandum to ICE making
such recommendations was dated November 2012.  To date, we have not received a response from
ICE on whether it will implement our suggested changes.

The purpose of this memorandum is to notify you of complaints involving ECJ that CRCL has
received since its 2012 site visit to the facility; detail CRCL's history of investigations, site visits,
and recommendations at or about Etowah; and recommend that ICE act to resolve the facility's
ongoing problems.

---

[1] See Attachment A for a list of all open complaints regarding conditions of detention at the Etowah County Jail opened
since the last CRCL site visit to the facility in May 2012.

*Protected by Attorney-Client and Deliberative Process Privileges*

**Summary**

Since our last visit to ECJ in May 2012, CRCL has opened 50 complaints for investigation alleging inadequate conditions of detention at the ECJ in Gadsden, Alabama; 29 of these currently remain open.[2]  The open complaints contain allegations involving a wide range of conditions of detention issues, including serious allegations in the areas of medical and mental health care, access to recreation, handling of detainee grievances, and use of segregation.  Given CRCL's multi-year history of investigating complaints of civil rights and civil liberties violations at ECJ, CRCL has strong reason to believe that many of these complaints identify real and continuing problems at the facility.  However, due to (b)(5), and concern that another investigation would yield similar findings and recommendations to ICE as have been made in years past, without movement towards resolution, CRCL will utilize this memorandum as a method of formally notifying ICE of CRCL's continuing concerns at ECJ.

**Background**

Prior Site Visits

CRCL has conducted site visits to ECJ on three separate occasions: September 12-13, 2006; June 30-July 1, 2008; and May 22 -25, 2012.  Medical, mental health, corrections, and environmental health and safety experts assisted CRCL during these three site visits.  As a result of detainee and staff interviews, document and records reviews, and direct onsite observations, the subject-matter experts identified a number of concerns, including (b)(5)

(b)(5)

(b)(5)                                                                             CRCL's subject matter experts provided written reports identifying specific concerns regarding ECJ, and making recommendations to address those concerns.  A summary of the major findings and recommendations of each site visit follows.

In 2006, CRCL brought corrections and environmental health and safety experts with us on site.  As a result of this site visit, CRCL made recommendations to ICE regarding (b)(5)

(b)(5)

In 2008, CRCL brought a medical expert on site.  As a result of this site visit, CRCL identified problems and made recommendations to ICE in the following areas:

(b)(5)

---

[2] In addition, CRCL has received 28 pieces of correspondence alleging civil rights violations at ECJ during this time frame that have not been opened as complaint investigations, but instead logged into the CRCL Compliance Branch database for tracking. This database is used to identify trends at detention facilities and across specific issue areas.

DHS-001-HQFO-00698-000002

(b)(5)

In 2012, after the continued receipt of serious complaints involving ECJ, CRCL returned a third time bringing with it corrections, medical care, mental health care, and environmental health and safety experts.  On November 2, 2012, CRCL provided ICE with a memorandum and attached the experts' written reports from the 2012 site visit.[3]  Problems/recommendations identified during this visit include:

(b)(5)

---

[3] See Attachment B for the CRCL 2012 memorandum and the experts' written reports.

DHS-001-HQFO-00698-000003

(b)(5)

ICE has not yet provided its response to the recommendations in the CRCL November 2012 memorandum.

<u>Additional Discussions with ICE</u>

On August 26, 2014, CRCL met with ICE and discussed (b)(5)
(b)(5) A major focus of the discussion was
(b)(5) compliance with the 2011 Performance Based National
Detention Standards (PBNDS 2011). (b)(5)
(b)(5)

(b)(5) At the close of
the meeting, (b)(5)

On December 19, 2014, CRCL sent ICE its own list of proposed ECJ improvements, which included suggestions related to (b)(5)
(b)(5) In January 2015, CRCL requested (b)(5)
(b)(5) During the March 4, 2015, ICE/CRCL quarterly meeting, (b)(5)
(b)(5)

(b)(5) To date, there have been no known changes at ECJ,
(b)(5) At the May 6, 2015 ICE quarterly meeting,
ICE reported (b)(5)
(b)(5)

**Conclusions:**

- Since CRCL's last site visit in 2012, CRCL has received approximately 50 complaints about the same or similar problems that CRCL and its experts found in three prior site visits. We therefore conclude that serious problems persist at ECJ.

---

[4] See Exhibit C.

(b)(5)

**Recommendations:**

Based on the above, CRCL recommends;

1. ICE should develop a comprehensive plan to address the deficiencies identified at ECJ through previous site visits and complaint investigations. (b)(5)

   (b)(5)

2. In developing its plan, ICE should address the issues raised in the complaints opened since 2012.

3. ECJ should transition to the 2011 Performance Based National Detention Standards.

Please inform us within 30 days whether you concur or non-concur with these recommendations by emailing a response to (b)(6) or by telephone at (b)(6) If you concur, please include an action plan.

It is CRCL's statutory role to advise Department leadership and personnel about civil rights and civil liberties issues, ensuring respect for civil rights and civil liberties in policy decisions and implementation of those decisions. This recommendation is pursuant to that role; we believe it can assist you in making ICE the best agency possible. We look forward to continuing to work with ICE on these important issues.

Copies to:

ice.civil.liberties@ice.dhs.gov



November 2, 2012

MEMORANDUM FOR:    Gary Mead
                   Executive Associate Director
                   Enforcement and Removal Operations
                   U.S. Immigration and Customs Enforcement

FROM:              Tamara J. Kessler
                   Acting Officer
                   Office for Civil Rights and Civil Liberties

                   Jeffrey S. Blumberg
                   Director for Compliance
                   Office for Civil Rights and Civil Liberties

SUBJECT:           Etowah County Detention Center
                   Complaint No. 11-11-ICE-0291
                   Complaint No. 11-12-ICE-0316
                   Complaint No. 11-12-ICE-0318 (A# (b)(6)
                   Complaint No. 11-10-ICE-0260 (A#
                   Complaint No. 11-12-ICE-0325 (A#
                   Complaint No. 12-01-ICE-0005 (A#
                   Complaint No. 12-01-ICE-0010 (A#

As you know, the U.S. Department of Homeland Security (DHS), Office for Civil Rights and Civil Liberties (CRCL), is conducting an investigation into conditions of detention for U.S. Immigration and Customs Enforcement (ICE) detainees at the Etowah County Detention Center (ECDC), located in Gadsden, Alabama.

Specifically, from July to October 2011, CRCL has received seven complaints, including multiple group complaints related to conditions at ECDC. Following a review of these complaints, CRCL decided to conduct a site review of ECDC to review medical and mental health care, environmental health and safety, and overall correctional policies.

CRCL conducted a site review at ECDC from May 22-25, 2012. We greatly appreciated the cooperation and assistance provided by ICE and ECDC personnel before and during the review. As part of the review, CRCL engaged the assistance of four subject-matter experts: a medical consultant; a mental health consultant; a penologist; and, an environmental health & safety

*Protected by Attorney-Client and Deliberative Process Privileges*

consultant. As a result of detainee and staff interviews, document review, and direct observation, the subject-matter experts identified concerns regarding conditions at the facility.

During the site visit, (b)(5)
in moving the facility from the 2000 National Detention Standards (NDS) to the more recently issued 2011 Performance Based National Detention Standards (2011 PBNDS). Given this information, CRCL's experts made recommendations based on the NDS, but also provided guidance and recommendations on what changes would be necessary for ECDC to meet the 2008 PBNDS and/or the 2011 PBNDS.

On May 25, 2012, as part of the ECDC site review closing discussions, CRCL and the subject matter experts discussed these concerns with ICE ERO field office management, including an ICE ERO Field Office Director, Supervisory Detention and Deportation Officer, and Supervisory Immigration Enforcement Agent. From the facility, ECDC senior management was present, including senior medical staff. The subject-matter experts also provided recommendations to address the concerns they identified.

Enclosed with this memorandum are the reports prepared by our subject-matter experts.[1] We expect to conclude this matter with a full report and recommendations, but that will take some time to prepare. Consequently, given that the experts' reports contain a variety of important and valuable findings and recommendations, we wanted to send them to you as soon as possible so that you would have the benefit of this feedback even while we continue to work on our final report. All of the recommendations are set forth below. With this memorandum, and consistent with our standard practice, we also request that you indicate to us whether ICE concurs with the recommendations made, and ask you to provide an action plan within 60 days.

**CRCL's medical consultant, made the following recommendations regarding medical care related to the 2000 National Detention Standard (NDS) titled, *Medical Care. (*Best practices and technical assistance recommendations follow**).

(b)(5)

---

[1] In general, CRCL's experts relied on the applicable ICE National Detention Standards (NDS) and related professional standards in conducting their work and preparing their reports and recommendations. However, some of their analysis or recommendations may be based on constitutional or statutory requirements that exceed the detention or professional standards.

DHS-001-HQFO-00698-000007

(b)(5)

(b)(5)

(b)(5)

---

(b)(5)

[3] The health coordinator can be reached at (b)(6)

(b)(5)

*Protected by Attorney-Client and Deliberative Process Privileges*    3

(b)(5)

(b)(5)

*Recommendations based on best practices:*

(b)(5)

---

[5] This latter change was already implemented by the HSA prior to our expert's departure.

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000010

(b)(5)

**CRCL's mental health consultant, made the following recommendations regarding mental health care. All of these recommendations relate to the 2000 National Detention Standard titled, *Medical Care* and/or *Suicide Prevention and Education*.**

(b)(5)

(b)(5)

(b)(5)

**CRCL's environmental health and safety consultant, made the following recommendations regarding environmental health and safety. The recommendations below** (b)(5)

(b)(5)

(b)(5)

(b)(5)

*Protected by Attorney-Client and Deliberative Process Privileges*

7

(b)(5)

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000013

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000015

(b)(5)

(b)(5)

**CRCL's corrections consultant made the following recommendations as a correctional expert. The recommendations below** (b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000018

(b)(5)

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000019

(b)(5)

It is CRCL's statutory role to advise department leadership and personnel about civil rights and civil liberties issues, ensuring respect for civil rights and civil liberties in policy decisions and implementation of those decisions. As a result, we hope that you will take immediate action to address the recommendations contained in this memorandum. <u>We request that ICE provide a response to CRCL within 60 days that indicates whether ICE concurs with the recommendations made and includes an action plan to address the recommendations.</u> We will take account of the progress you have made in addressing these recommendations when we issue our final report. You can send your response by email. If you have any questions, please contact Policy Advisor (b)(6) You may also contact Jeffrey Blumberg directly.

Copies to:

Dr. Jon Krohmer
Assistant Director
ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)

Tae D. Johnson
Assistant Director
Detention Management Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)

(b)(6)
Deputy Division Director
Investigative Support Unit
Office of Professional Responsibility
U.S. Immigration and Customs Enforcement
(b)(6)

Kevin Landy
Assistant Director
Office of Detention Policy and Planning
U.S. Immigration and Customs Enforcement
(b)(6)

(b)(6)
Management Program Analyst
Information Disclosure
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)

Jeffrey Gilgallon
Acting Chief of Staff
Office of Professional Responsibility
U.S. Immigration and Customs Enforcement
(b)(6)

(b)(6)
Section Supervisor, Information Disclosure
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)

(b)(6)
Detention & Deportation Officer
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)

Enclosures

# CORRECTIONS EXPERT'S REPORT

## ON

## ETOWAH COUNTY DETENTION CENTER

Prepared by:

(b)(6) MAS

Roseville, CA

June 10, 2012

~~Privileged and Confidential~~

~~For Official Use Only~~

*Protected by the Attorney Work Product and Deliberative Process Privileges*

**ETOWAH COUNTY DETENTION CENTER**

## I.  SUMMARY OF INVESTIGATION

The U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) received several complaints regarding detainees held in custody by U.S. Immigration and Customs Enforcement (ICE) at the Etowah County Detention Center (ECDC) in Gadsden, Alabama.[1]  The specific allegations contained in the complaints include:  excessive detainee transfers interfering with detainee immigration court matters; discrimination; retaliation against detainees for making complaints; inadequate access to legal resources; extended periods of lockdowns; inadequate time and resources for recreation; ineffective detainee grievance procedures; overcrowding; inadequate access to telephone and mail services; harassment by staff; and inadequate visitation.  Other allegations related to inadequate medical and mental health care, inadequate quantity and quality of food, inadequate types and amounts of clothing and bedding, inadequate laundry services, and inadequate personal hygiene supplies.  Medical care, mental health care, and environmental health and safety issues are addressed by other experts who participated in this review.

This investigation found specific operational deficiencies related to allegations raised in the CRCL complaints, as well as other operational deficiencies observed during a site visit conducted as part of the investigation.  I have included recommendations below to address these deficiencies, as well as some recommendations based on professional best practices.

This is a report of my findings and recommendations.  My recommendations are based on correctional experience, ICE's detention standards, and recognized correctional standards including those published by the American Correctional Association (ACA).

## II.  EXPERT PROFESSIONAL INFORMATION

I am an expert corrections consultant.  My educational background includes a Bachelor of Science in Organizational Behavior from the University of San Francisco and a Master's Degree in Criminology, Law, and Society from the University of California at Irvine.

My correctional work experience includes 26 years operating, managing, and performing direct supervision and oversight for up to ten male and female prisons with approximately 40,000 inmates and 15,000 staff for the California Department of Corrections and Rehabilitation (CDCR), where I served as

(b)(6)

(b)(6) I was also the Director of Rehabilitation and Activation for the Federal Medical Prison Receiver (b)(6) reporting to the (b)(6) while also remaining a CDCR employee.  My duties entailed creating evidenced-based rehabilitation program models in an integrated care environment and designing the physical configuration of the associated program space for a medical facility being built to correct constitutional deficiencies declared by the court.  The medical facility and programs were built to accommodate vulnerable inmates with significant medical needs and mental health issues.

---

[1] This expert report addresses allegations contained in the following CRCL complaints:  11-11-ICE-0291, 11-12-ICE-0316, 11-12-ICE-0318, 11-10-ICE-0260, 11-12-ICE-0325, 12-01-ICE- 0005, and 12-01-ICE-0010.

I have provided expert reports and testimony for prison-related litigation in the State of Hawaii, State of Pennsylvania, and the State of California, and testified in over 300 California Senate and Assembly legislative hearings related to prison issues. My past experience also includes teaching criminal justice related subject matter at Stanford University and serving as an expert panelist for criminal justice research, sentencing, gender, transgender, correctional operations, probation, and California Public Safety Realignment issues. I am currently the (b)(6) (b)(6) and a member of the (b)(6) appointed by the California State Legislature. (b)(6) provides oversight of the CDCR's inmate prison rehabilitation programs and reports to the legislature.

## III.    COMPLAINT ISSUES ASSIGNED

CRCL received several complaints regarding detainees held by ICE at ECDC in Gadsden, Alabama. I was asked to review the detainees' complaints, which allege that their civil rights are being violated by conditions of confinement at ECDC, gather and analyze relevant facts, and assess ECDC's compliance with the relevant ICE detention standards and the generally accepted practices in the field of adult detention. The specific complaints that I was assigned to respond to raised allegations of excessive detainee transfers interfering with detainee immigration court matters; discrimination; retaliation; lack of access to law library and legal resources; excessive lockdowns; inadequate recreation access; ineffective detainee grievance procedures; overcrowding; difficulty in making and receiving telephone calls; difficultly in sending outgoing mail; harassment by staff; and an inadequate visitation program.

## IV.    RELEVANT STANDARDS

### A.    ICE Detention Standards

ICE's 2000 National Detention Standards (NDS) apply to ECDC, and the facility has been covered by these standards during the entire period relevant to this investigation. (b)(5)

(b)(5)

The allegations regarding ECDC that are contained in the complaints in this case relate to the period when ECDC was covered by the NDS. Consequently, I relied on the NDS when looking at the specific allegations regarding current conditions at the facilities, and also provided as part of my analysis what the implementation of the PBNDS 2011 standards will require for compliance.

### B.    Additional Relevant Standards / Professional Best Practices

Where the NDS do not address a specific issue, I made recommendations based on my correctional experience, best correctional practices, and recognized correctional standards including those published by ACA.

## V.    FACILITY BACKGROUND AND POPULATION DEMOGRAPHICS

ECDC is located in Gadsden, Alabama, and has an Intergovernmental Agreement (IGA) with the United States Marshals Service to house federal detainees. ICE has made arrangements to house immigration detainees pursuant to this agreement. ECDC has a rated population count of 879 inmates. On May 23,

2012, ECDC housed 422 county inmates and 327 ICE detainees. ICE currently contracts for 374 detainee beds at ECDC. ECDC houses only male detainees.

ICE detainees are housed in three housing units at ECDC: 4, 9, and 10. Detainees held in segregation are housed in Unit 3. The rated capacity of each housing unit is: Unit 4, 112 beds; Unit 9, 134 beds; Unit 10, 128 beds; and Unit 3, 24 beds. The ICE population housed on May 23, 2012, was: Unit 4, 102; Unit 9, 111; Unit 10, 111; and Unit 3, 3. The total ICE population housed at ECDC on May 23, 2012, in all housing units was 327, which is within the rated capacity.

ECDC is accredited by the ACA. ECDC received an overall acceptable rating on its ICE National Detention Standards Annual Compliance Review by MGT of America, Inc., on August 19, 2010, and on July 21, 2011.

## VI.     REVIEW PURPOSE AND METHODOLOGY

The purpose of this review is to examine the specific allegations made in the complaints, as well as to identify other areas of concern regarding the operation of the facility. In the context of this report, a finding of "substantiated" means an allegation that was investigated and determined to have occurred; a finding of "not substantiated" means an allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred; and a finding of "unfounded" means an allegation that was investigated and determined not to have occurred.

As part of this review, I examined a variety of documents; conducted a site visit at ECDC on May 23-25, 2012, along with CRCL staff and experts who examined medical care, mental health care, and environmental health and safety issues; and interviewed staff and detainees. Detainee names are not used in this report to protect the confidentiality of the detainees; their names and alien numbers are listed in a separate appendix to the report. One of the detainees who made a complaint, Detainee #1, was interviewed and still housed at ECDC on the dates of the site visit.

The staff at ECDC was helpful and cooperative during our site visit, and I appreciated their assistance. I also appreciated the cooperation and assistance provided by ICE staff before, during, and after our visit.

In preparation for the site visit and completion of this report, I undertook the following tasks:

- Reviewed multiple detainee complaints, and one filed by a non-profit organization representing detainee interests
- Reviewed detainee housing rosters
- Reviewed ECDC inmate handbook
- Reviewed ECDC policies including:
  - Environmental Health and Safety
  - Transportation
  - Admission and Release
  - Detainee Classification System
  - Facility Security and Control
  - Funds and Personal Property
  - Hold Rooms
  - Population Counts
  - Sexual Abuse and Assault Prevention and Intervention

- o Special Management Units
- o Staff Detainee Communication
- o Use of Force
- o Disciplinary Policy
- o Food Service
- o Personal Hygiene
- o Correspondence and Other Mail
- o Recreation
- o Religious Practices
- o Telephone Access
- o Visitation
- o Voluntary Work Program
- o Detainee Handbook
- o Detainee Grievance Procedures
- o Access to Legal Material
- o Detention Files
- Reviewed the ICE National Detainee Handbook, February 2009
- Reviewed relevant NDS and PBNDS 2011 standards:
  - o Correspondence and Other Mail
  - o Detainee Grievance Procedures/Grievance System
  - o Detainee Handbook
  - o Food Service
  - o Environmental Health and Safety
  - o Access to Legal Material/Law Libraries and Legal Material
  - o Recreation
  - o Religious Practices
  - o Staff-Detainee Communication
  - o Telephone Access
  - o Visitation
  - o Detainee Transfers
  - o Special Management Units
  - o Custody Classification System
  - o Population Counts
  - o Sexual Abuse and Assault Prevention
  - o Disciplinary System
- Reviewed relevant American Correctional Association (ACA) correctional and detention and standards
- Reviewed ICE National Detention Standards Annual Compliance Review by MGT of America, Inc., August 19, 2010
- Reviewed ICE National Detention Standards Annual Compliance Review by MGT of America, Inc., July 21, 2011

While at the ECDC during the week of May 23-25, 2012, I performed the following tasks:

- Reviewed the ECDC ICE Detainee Handbook
- Visited all units housing male ICE detainees
- Inspected a sample of cells in the housing units
- Reviewed Unit Activity Log Books

DHS-001-HQFO-00698-000026

- Interviewed the housing officers
- Reviewed institutional operational policies regarding religious diets
- Observed food delivery to housing units
- Reviewed law library access at ECDC
- Inspected the law libraries for Housing Units 4, 9, and 10 (Unit 3 utilizes Unit 9's or 10's)
- Reviewed the facility schedule for law library
- Inspected the recreational yards for Housing Units 3, 4, 9, and 10
- Reviewed the recreation schedules for Housing Units 3, 4, 9, and 10
- Inspected the visitation rooms for Housing Units 3, 4, 9, and 10
- Reviewed the visitation schedules for Housing Units 3, 4, 9, and 10
- Reviewed the religious service schedules for Housing Units 3, 4, 9, and 10
- Reviewed the commissary delivery schedules for Housing Units 3, 4, 9, and 10
- Reviewed religious service areas in Housing Units 4, 9, and 10
- Interviewed custody and program personnel regarding law library, religious services, visitation, and recreation programs
- Inspected the Special Management Unit
- Inspected mailrooms and interviewed mail staff
- Inspected mail postmarks and delivery process/timelines
- Tested the detainee telephones
- Inspected telephone pro bono number postings in the housing units in Units 3, 4, 9 and 10
- Reviewed detainee grievances for 2011 and 2012
- Reviewed one year of facility disciplinary reports
- Reviewed disciplinary segregation orders
- Interviewed Detainee #1
- Interviewed randomly selected male detainees in Units 3, 4, 9, and 10
- Spoke with various facility staff and management during the course of the review
- Met with various ICE staff during the course of the review

## VII.     FINDINGS, ANALYSIS, AND RECOMMENDATIONS

### A.     Allegation #1 – Excessive Lockdowns - Disciplinary and Counts

#### 1.     *Allegations and Findings*

*Allegations:*  On October 26, 2011, the American Bar Association wrote to the CRCL forwarding a complaint by Detainee #4, dated September 9, 2011, alleging that detainees were being locked up in their cells for up to 21 hours at a time.  He also alleged that detainees were locked down in their cells when the noise level was too loud.

In a letter received by CRCL on August 3, 2011, signed by 100 detainees in Unit 9, the detainees allege they are locked in their cells 16 hours per day and when there is excessive noise in the unit.

In an email dated June 29, 2011, a detainee complaint was forwarded to CRCL on behalf of Detainee #1.  Detainee #1 alleges that detainees are locked in their cells for 13-14 hours per day and threatened to be locked down in their cells for excessive noise.

On December 2, 2011, the DHS Office of Inspector General (OIG) received a signed complaint from Detainee #3 alleging that he was subjected to facility lockdowns for periods of 21 hours and longer.

*Findings:* (b)(5)

     *2.     Analysis*

I interviewed housing officers, reviewed the unit log record, interviewed detainees, and reviewed the count schedule to investigate this complaint. Based on these reviews, and discussions with staff and detainees, it is my conclusion (b)(5)

(b)(5)

(b)(5)

(b)(5)

     *3.     Recommendations*

(b)(5)

[b](5)

**B.** **Allegation #2 – Lockdowns Related to Commissary Distribution**

    *1.*    *Allegation and Finding*

*Allegation:* In the letter received by CRCL on August 3, 2011, signed by 100 detainees in Unit 9, the detainees allege they are subject to being locked down in their cell during their free time when commissary orders are distributed.

*Findings:* [b](5)

    *2.*    *Analysis*

Based on discussion with the housing unit officers and detainees, and a review of the housing unit activity logs, [b](5)

[b](5)

    *3.*    *Recommendations*

[b](5)

(b)(5)

### C. Allegation #3 –Excessive Transfers - Missed Court Dates, Denied Access to Legal Materials

#### 1. Allegations and Findings

*Allegations:* On December 2, 2011, the DHS Office of Inspector General (OIG) received a signed complaint from Detainee #3 alleging that he was transferred seven times in 25 days, which resulted in missed court dates. Detainee #3 also raised concerns regarding missing another scheduled court date as a result of being housed at ECDC.

On October 26, 2011, the American Bar Association wrote to the CRCL forwarding a complaint by Detainee #4, dated September 9, 2011, alleging the detainee was transferred nine times during the period of July through September 2011, resulting in denial of access to his legal materials. The numerous transfers also interfered with his immigration related hearings.

*Findings:* (b)(5)

#### 2. Analysis

A review of Detainee #3's detention history (b)(5)

(b)(5)

(b)(5) I also reviewed ICE Policy 11022.1, Detainee Transfers, issued on January 4, 2012. This directive consolidates and revises existing ICE policies on detainee transfer determinations and how to conduct transfers out of an area of responsibility. Detainee #3's complaint was made prior to the revision of the transfer policy. The revised transfer policy should reduce the number of transfers that detainees are subjected to and result in a more cost effective and efficient transfer system.

Detainee #4 could not be interviewed as he had been released on December 08, 2011. A review of the ICE Detainee Request Log Book for the ICE office located at ECDC identified that Detainee #4 requested on an ICE detainee request form dated September 7, 2011, a copy of all documents pertaining to his detention transfers made between July 2011 and September 7, 2011. A review of the ECDC Access to Legal Materials policy (b)(5) A review of the detainee grievances (b)(5)

(b)(5)

(b)(5) As stated previously, the revised ICE Policy 11022.1, Detainee Transfer, issued on January 4, 2012, should reduce the number of transfers that detainees are subjected to and result in a more cost effective and efficient transfer system, including providing detainees access to legal materials and reduce the interference with scheduled immigration hearings.

### 3. Recommendations

(b)(5)

## D. Allegation #4 – Inadequate Transfer Notice and Inhumane Conditions During Transportation

### 1. Allegations and Findings

*Allegations:* In an email dated June 29, 2011, a detainee complaint was forwarded to CRCL on behalf of Detainee #1. Detainee #1 alleges that he was transferred without the proper Detainee Transfer Notification Letter and subjected to inhumane conditions during the transportation process. The inhumane conditions included being transported on a bus without bathroom facilities and being required to sleep on kitchen floors and benches while en route from Monmouth County Jail in New Jersey to ECDC. Detainee #1 describes that during the transportation process a detainee with a medical problem was required to defecate in the back of a bus without a restroom while the other detainees were directed by ICE staff to go to the front of the bus

*Findings:* (b)(5)

### 2. Analysis

I interviewed Detainee #1 and reviewed his file to determine if a Detainee Transfer Notification letter had been provided to Detainee #1 prior to transportation to ECDC. (b)(5)

(b)(5)

(b)(5)

### 3. Recommendations

(b)(5)

(b)(5)

**E.      Allegation #5 – Legal Services**

     *1.      Allegation and Finding*

*Allegation:*  In the letter received by CRCL on August 3, 2011, signed by 100 detainees in Unit 9, the detainees allege that they have two computers for 100 detainees and the law library is only accessible four hours daily.

*Finding*(b)(5)

     *2.      Analysis*

Section III.B of the NDS Access to Legal Material standard requires "The law library shall provide an adequate number of typewriters and/or computers, writing implements, paper, and office supplies to enable detainees to prepare documents for legal proceedings."  Section III.G requires each detainee receive access to the law library a minimum of five hours per week.  A review of grievances and detainee ICE requests and staff interviews(b)(5)

(b)(5)

ECDC staff reported that detainees (b)(5)

(b)(5)

DHS-001-HQFO-00698-000032

(b)(5)

1. *Recommendations*

(b)(5)

(b)(5)

**F.      Allegation #6 – Visitation**

  *1.      Allegation and Finding*

*Allegation:*  In a Public Complaint letter dated September 30, 2011, to ICE on behalf of the ECDC detainees, a complaint was made regarding the non-contact video visitation at ECDC.

*Finding:* (b)(5)

  *2.      Analysis*

ECDC visitation is completed through a video visitation system.  Section III.H.1 of the NDS Visitation standard requires 30 minute visits under normal operating conditions. (b)(5)

(b)(5)

  *3.      Recommendations*

(b)(5)

### G.   Allegation #7 – Recreation

*1.   Allegation and Finding*

*Allegation:*  In the letter received by CRCL on August 3, 2011, signed by 100 detainees in Unit 9, the detainees allege they do not have any exercise equipment to exercise like human beings.  Additionally, on September 30, 2011, a public complaint was made to ICE on behalf of ECDC detainees regarding the lack of outdoor recreation space.

*Finding:* (b)(5)

*2.   Analysis*

(b)(5)

(b)(5)

(b)(5)

(b)(5)

### 3. Recommendations

(b)(5)

## H. Allegation #8 – Mail

### 1. Allegation and Finding

*Allegation:* In a letter received by CRCL on August 3, 2011, signed by 100 detainees in Unit 9, the detainees allege indigent detainees are not getting the three stamped envelopes they are entitled to.

***Finding:*** (b)(5)

(b)(5)

### 2. Analysis

A review of the ECDC Correspondence and Other Mail Policy identified (b)(5)

(b)(5)

### 3. Recommendations

(b)(5)

(b)(5)

### I. Allegation #9 – Staff-Detainee Communication, Discourteous Treatment, and Staff Intimidation

    *1.    Allegation and Finding*

*Allegation:* In an email dated June 29, 2011, a detainee complaint was forwarded to CRCL on behalf of Detainee #1. Detainee #1 alleges that he was threatened by an officer with a lock up and physical intimidation when he was trying to bring to the officer's attention an urgent medical issue.

*Finding:* (b)(5)

    *2.    Analysis*

(b)(5)

(b)(5)

During the onsite investigation CRCL and expert staff visited the units housing detainees. (b)(5)

(b)(5)

*3.      Recommendations*

(b)(5)

**J.      Allegation #10 – Classification**

*1.      Allegation and Finding*

*Allegation:*  In an email dated June 29, 2011, a detainee complaint was forwarded to CRCL on behalf of Detainee #1.  Detainee #1 alleges that he was inappropriately housed with maximum classification detainees.

*Finding:* (b)(5)

*2.      Analysis*

I reviewed Detainee #1's detention file and also ECDC's classification policy.  (b)(5)

(b)(5)

*3.      Recommendations*

- None.

**K.      Allegation #11 – Identification**

*1.      Allegation and Finding*

*Allegation:*  In a letter received by CRCL on August 03, 2011, signed by 100 detainees in Unit 9, the detainees allege they are not given picture identification, only a wrist band that does not provide adequate identification.  They allege that the nurse only requires the wristband identification for medication distribution and detainees are concerned about medication being distributed to the wrong detainee.

*Finding:* (b)(5)

(b)(5)

2.    *Analysis*

Detainees are only issued a wrist band for identification purposes.  Staff Interviewed reported that the

(b)(5)

3.    *Recommendations*

(b)(5)

**L.    Allegation #12 – Telephone Access**

1.    *Allegation and Finding*

*Allegation:*  In the letter received by CRCL on August 3, 2011, signed by 100 detainees in Unit 9, the detainees allege they are not allowed to make one free phone call per week to call their families.

**Finding:** (b)(5)

2.    *Analysis*

ECDC's Telephone Policy provides (b)(5)

(b)(5)

3.    *Recommendations*

- (b)(5)

**VIII.    OTHER ISSUES AND OBSERVATIONS**

**A.    Food Service Special Medical Diets and Religious Diets**

1.    *Issue*

A review of detainee grievances (b)(5)

(b)(5)

(b)(5)

2. *Recommendations*

(b)(5)

**B. Special Management Unit**

1. *Issue*

During my site visit, I inspected the Special Management Unit, Unit 3.  I reviewed the detainee lock up orders and Special Housing Unit Record, Form BP 292(52). (b)(5)

(b)(5)

(b)(5)

2. *Recommendations*

(b)(5)

## IX. SUMMARY OF ECDC RECOMMENDATIONS

Regarding the specific deficiencies I found as part of my inquiry into these complaints, I have recommended the following:

(b)(5)

(b)(5)

(b)(5)

Regarding other areas where I would propose changes to meet best practices for adult correctional facilities, I have recommended the following:

(b)(5)

DHS-001-HQFO-00698-000043

**APPENDIX A**

**Detainee Name and A Numbers**

Detainee #1:  (b)(6)

Detainee #2:

Detainee #3:

Detainee #4:

Detainee #5:

Detainee Unit 9 Complaint (100 detainees)

Public Complainant by Women's Refugee Commission (on behalf of detainees at various facilities)

# Report for the U.S. Department of Homeland Security Office for Civil Rights and Civil Liberties

## Environmental Health and Safety Report

**Etowah County Detention Center**

Prepared By:

(b)(6) R.D., L.D., R.S., CLLM

6/26/2012

Confidential
For Official Use Only

Protected by Attorney-Client and Deliberative Process Privileges

**Introduction**

On May 23-25, 2012, I assessed the environmental health and safety conditions at the Etowah County Detention Center (ECDC), Gadsden, Alabama. This review was provided under contract with the United States Department of Homeland Security, Office for Civil Rights and Civil Liberties (CRCL). Accompanying me on this investigation were (b)(6) Policy Advisor, CRCL, and (b)(6) Senior Policy Advisor, CRCL, as well as three other subject matter experts who examined ECDC's medical care, mental health care, and correctional operations.

The purpose of this review was to investigate complaints made by U.S. Immigration and Customs Enforcement (ICE) detainees of various alleged violations of civil rights and civil liberties at ECDC. In particular, I examined allegations contained in Complaint Nos. 11-11-ICE-0291, 11-12-ICE-0316, and 12-08-ICE-0166. This investigation was conducted to obtain an impression of the validity of the allegations by assessing the facility's adherence to applicable standards and best practices related to environmental conditions. The areas of review included the intake area, kitchen, laundry, medical unit, detainee living units, and special housing unit.

**Methodology**

The basis of this report includes document reviews, tour of the facility, interviews with facility staff and detainees, visual observations, and environmental measurements. The findings and recommendations contained in this report are solely those of the author. The report cites specific examples of conditions found during this review, however, they should not be considered as all inclusive of the conditions found during the inspection. Consideration was given to national and state standards including the 2000 ICE National Detention Standards (NDS); 2011 Performance Based National Detention Standards (PBNDS 2011); Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, published by the American Correctional Association (ACA); and Dietary Reference Intakes (DRIs), Institute of Medicine of the National Academies, 2006.



ECDC is contractually required to adhere to the NDS. (b)(5)
(b)(5)
(b)(5) Therefore, recommendations will include references to the PBNDS 2011.

I would like to extend my sincere appreciation to Sheriff Todd Entrekin and his staff. The facility officials and staff were helpful, accommodating, and placed no limitations on my requests. Their cooperation and assistance was greatly appreciated.

**Facility Overview**

The Etowah County Sheriff's Department is responsible for the daily operation of ECDC. ECDC has a contract with the United States Marshals Service (USMS) to house federal prisoners

including ICE detainees.  The facility opened in 1993.  ECDC currently houses ICE detainees in housing units 4, 9, and 10 with a maximum population of 374.

**Findings**

Allegation No. 1:  Complaint No. 11-11-ICE-0291 alleges that ECDC serves child sized portions of food, serves half of an orange once per week with no additional fruit, serves milk once per week, diet trays receive half of a banana or one egg for breakfast, the food lacks nutritional value and is bad and tasteless.  Furthermore, in Complaint No. 11-12-ICE-0316, the Women's Refugee Commission reports they are concerned for the well-being of detainees at ECDC based upon complaints that detainees are served insufficient food, hungry, and starving to death.

Findings:   (b)(5)

(b)(5)

Applicable Standards:  The NDS Food Service standard and the Dietary Reference Intakes (DRIs) are applicable to these allegations.  DRIs are a set of nutrient reference values that set the national nutrition policy and establish safe upper limits of intake.  DRIs include four sets of nutrient standards:  Estimated Average Requirement (EAR), Recommended Dietary Allowance (RDA), Adequate Intake (AI), and Tolerable Upper Intake Level (UL).  The DRIs provide guidance regarding planning nutrient intakes for groups, such as residential schools and prisons.  The NDS Food Service standard requires that "A registered dietitian shall conduct a complete nutritional analysis of every master cycle menu planned by the FSA.  Menus must be certified by the dietitian before implementation."   (b)(5)   the PBNDS 2011, they must meet the requirement that "A registered dietitian shall conduct a complete nutritional analysis that meets U.S. Recommended Daily Allowances (RDA), at least yearly, of every master-cycle menu planned by the FSA.  The dietitian must certify menus before they are incorporated into the food service program.  If necessary, the FSA shall modify the menu in response to the nutritional analysis to ensure nutritional adequacy.  In such cases, the menu shall be revised and re-certified by the registered dietician."

Analysis:  A registered dietitian approved the current 35 day regular cycle menu and 14 day kosher and vegetarian cycle menus in March 2012.  The goal of group menu planning is to achieve usual intakes in the group that meet the nutritional requirements of most individuals, but that are not excessive.   (b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000048

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

Conclusion: (b)(5)

(b)(5)

Recommendations:

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000050

(b)(6)

(b)(5)

Allegation No. 2:  Complaint No. 11-11-ICE-0291 alleges that upon arrival detainees are provided with one uniform  that may not be the proper size and they cannot change it for the proper size until a later time, one pair of socks, one pair of boxer shorts, one sheet, one short blanket with holes, and no pillow.  Additionally, the allegation alleges detainees are not provided laundry bags and do not have hangers for washing laundry in the housing units. Complaint No. 12-08-ICE-0166 further alleges that uniforms are traded every three to four days with other inmates and if the upper cells are changed one day, the lower cells have to wait until the uniforms are laundered to change clothing, which is unsanitary, inhumane, and not hygienic.  The complaint further indicates that some people are not wearing underwear; therefore, it is not healthy for a person to share clothing with other people.  They suggest that two sets of personal clothes or uniforms be issued and that uniforms should be placed in laundry bags, sent to the laundry room, and returned the same or next day.

Findings:  ECDC issues all detainees (b)(5)

(b)(5)

Applicable Standards:  The NDS Issuance and Exchange of Clothing, Bedding, And Towels standard includes the requirement that "all new detainees shall be issued clean, temperature-appropriate, presentable clothing during in-processing" and "detainees shall be provided with clean clothing, linen and towels on a regular basis to ensure proper hygiene.  Socks and undergarments will be exchanged daily, outer garments at least twice weekly and sheets, towels, and pillowcases at least weekly" and that "more frequent exchanges of outer garments may be appropriate, especially in hot and humid climates."

Analysis:  ECDC processes laundry in two areas.  The main laundry on the ground floor is equipped with four 60-pound washing machines and an equivalent number of dryers.  The second laundry area located behind Unit-9 is equipped with two 35-pound washing machines and two equivalent dryers.  (b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000053

(b)(5)

(b)(5)

(b)(5)

(b)(6)

(b)(5);(b)(6)

Conclusion: (b)(5)

(b)(5)

Recommendations:

(b)(5)

DHS-001-HQFO-00698-000055

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000056

(b)(5)

**Allegation No. 3:**  Complaint No. 11-11-ICE-0291 alleges detainees are not provided a care package containing shampoo, comb, bar soap, toothbrush and toothpaste, the toothbrush and toothpaste are provided on the side.  Furthermore, the complaint alleges each detainee gets one roll of toilet paper per week, which is not enough.

Findings:  This allegation (b)(5)
(b)(5)  The allegation (b)(5)  The allegation
(b)(5)

Applicable Standards:  The NDS Admission and Release standard specifies, "Staff shall provide male and female detainees with the items of personal hygiene appropriate for, respectively, men and women.  They will replenish supplies as needed."

Analysis:  ECDC provides each detainee (b)(5)
(b)(5)  The
ECDC Inmate/Detainee Handbook indicates, "Personal hygiene items for both male and female detainees, such as soap, toothpaste, toothbrushes, hair combs, and other items will be issued to you upon admission.  If you should run out of an item, see your housing officer."  (b)(5)
(b)(5)

Conclusion: (b)(5)
(b)(5)

Recommendation:

(b)(5)

Allegation No. 4:  Complaint No. 11-11-ICE-0291 alleges there are approximately 120 detainees in each pod and the place is like a zoo.  Additionally, the complaint indicates there is only one small desk in every cell and it is not enough for two people to use.

Finding: (b)(5)

Applicable Standards:  Although the NDS does not specifically address cell space and furnishings, the Environmental Health and Safety standard indicates "Environmental health conditions will be maintained at a level that meets recognized standards of hygiene."  The NDS further specifies, "The standards include those from the American Correctional Association."   Therefore, ACA Safety standards 4-ALDF-1A-10 regarding Multiple Occupancy Rooms/Cells, 4-ALDF-1A-11 related to Cell/Room Furnishings and 4-ALDF-1A-12 addressing Dayrooms are applicable.

Analysis:  ACA standards clearly define the minimum encumbered and unencumbered space required for each detainee.  (b)(5)
(b)(5)

Conclusion: (b)(5)
(b)(5)

Allegation No. 7:  Complaint No. 11-11-ICE-0291 alleges "there are about seven showers in the shower area right next to each other, no dividers or curtains like most jails or detention centers have, is that for security reasons or degrading reasons?  That means all jails have curtains that covers at least the body only are breaking the law?"

<u>Findings:</u>   NDS standards do not address privacy in bathrooms and showers. The allegation (b)(5)

(b)(5)

<u>Applicable Standards:</u>   ECDC should comply with ACA Plumbing Fixtures standard 4-ALDF-4B-09.  In preparation for transitioning to the PBNDS 2011, ECDC should conform to the Bathing and Toilet Facilities standard requiring, "Detainees shall be provided with a reasonably private environment in accordance with safety and security needs."

<u>Analysis:</u>  (b)(5)

(b)(5)

(b)(5)                                                                                    ACA standard 4-ALDF-4B-09 requires "a minimum ratio of one shower for every 12 inmates." (b)(5)

(b)(5)

<u>Conclusion:</u>  (b)(5)

(b)(5)

<u>Recommendations:</u>

(b)(5)

(b)(5)                                            the PBNDS 2011, requiring "a minimum ratio of one shower for every 12 inmates" (b)(5)

(b)(5)

(b)(5)                              compliance with the PBNDS 2011 Bathing and Toilet Facilities standard indicating, "Detainees shall be provided with a reasonably private environment in accordance with safety and security needs" (b)(5)

(b)(5)

**Other Observations**

Ceiling Vents and Grilles

Cells throughout ECDC had grilles blocked with a buildup of paper or covered with pieces of cardboard.  The buildup was particularly thick in Segregation Cell #302, as there was a one-inch accumulation of tissue stuffed behind the grille.  A piece of cardboard held in place with a Styrofoam cup and toothbrush covered the vent in Segregation Cell #301.  Pieces of cardboard cut to the size of the vent openings blocked the grille in the Unit-9 laundry.  The vents in Medical Unit Cell #5 and Unit-4 Cell #424 were blocked with an accumulation of toilet tissue. Blocked or clogged air ducts impede air circulation by interfering with the proper functioning of the HVAC system.

> Applicable Standards:  ACA Housekeeping standard 4-ALDF-1A-04 specifies, "The facility is clean and in good repair."

> Conclusion:  Detainees are blocking the air vents and grilles with tissue and cardboard. Staff are not monitoring and removing the obstructions.

> Recommendation:

(b)(5)

Shower Rooms

(b)(5)

(b)(5)   Areas of what appeared to be mildew were growing in the grout and on the ceiling. Condensation had collected on the ceiling and the paint was peeling off the ceiling.  Thick rust had accumulated on the ventilation grates and windowsill.  One of the two lights had burned out, creating a dim environment with only 5-foot candles of light.  The shower drains had a thick buildup of organic debris and soap scum and some drains were almost completely blocked.  During my visit, maintenance repaired the light and ECDC administration advised (b)(5)

(b)(5)

(b)(5)   Unit-4 provided 12 and 17 foot-candles of light at the dayroom mirrors.  The Unit-10 dayroom sink area provided 8 to 24 foot-candles of light, with less than 20 foot-candles at three of the five mirrors. (b)(5)
A minimum of 20 foot-candles (ACA standard 4-ALDF-1A-14) is necessary for proper personal grooming.

> Applicable Standards:  Applicable standards include ACA Housekeeping standard 4-ALDF-1A-04 and ACA Environmental Conditions standard 4-ALDF-1A-14.

Conclusion: (b)(5)

(b)(5)

Recommendations:

(b)(5)

### Segregation Unit Cells

A caked substance that appeared to be dried toothpaste obstructed the intercom speaker, the shelf was rusty, paint was peeling on the desk, and the bunks were dusty in unoccupied cell #302. (b)(5)

(b)(5) Cell #303 housed a detainee and his property included four Styrofoam meal containers, seven Styrofoam cups, a significant number of commissary food items, books and personal hygiene products. Additionally, "artwork" was observed on the wall created with what appeared to be dried toothpaste and a piece of a dark colored plastic trash bag covered the overhead light fixture limiting the illumination levels to 8.4 foot-candles at the desk and 4.8 foot-candles at the mirror. Five Styrofoam food containers were noted in cell #301. Each meal in the Segregation Unit is served in one Styrofoam container.

Applicable Standards: ACA Standard 4-ALDF-1A-04 specifies, "The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and inmates." The ACA Environmental Conditions standard 4-ALDF-1A-14 requiring a light level of at least 20 foot-candles in personal grooming areas and at the writing surface is applicable. ECDC should also comply with the NDS Environmental Health and Safety Garbage and Refuse standard requiring "Garbage and refuse will be collected and removed as often as necessary to maintain sanitary conditions and to avoid creating health hazards."

Conclusion: (b)(5)

(b)(5)

(b)(5)

Recommendations:

(b)(5)

(b)(5)

**Summary of Recommendations**

(b)(5)

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000063

(b)(5)

(b)(5)

(b)(5)

(b)(5)

**Best Practices**

(b)(5)

(b)(5)

(b)(5)

DHS-001-HQFO-00698-000065

(b)(5)

(b)(5)

CONFIDENTIAL

REPORT FOR THE

U.S. DEPARTMENT OF HOMELAND SECURITY

OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES

Investigation regarding Etowah County Detention Center

Complaint Numbers   11-11-ICE-0291
                    11-12-ICE-0316
                    11-12-ICE-0318
                    11-10-ICE-0260
                    11-12-ICE-0325
                    12-01-ICE-0005
                    12-01-ICE-0010

Presented by (b)(6) M.D.

DHS-001-HQFO-00698-000067

ETOWAH COUNTY DETENTION CENTER (ECDC)

Site visit May 23-25, 2012

INTRODUCTION/REFERRAL ISSUE

The U.S. Department of Homeland Security's (DHS) Office for Civil Rights and Civil Liberties (CRCL) asked me to participate in an investigation of complaints it received relating to the Etowah County Detention Center (ECDC) in Gadsden, Alabama. The complaints raised a variety of allegations regarding the conditions of detention for detainees being held by U.S. Customs and Immigration Enforcement (ICE) at ECDC, including inadequate medical and mental health care. Although the overall CRCL investigation addressed additional allegations, my review focused on the adequacy of mental health care for ICE detainees at ECDC.

PROFESSIONAL QUALIFICATIONS

I currently serve as (b)(6)
(b)(6)
(b)(6) I have been on the faculty at UMMS since 1987. In addition to research and teaching activities, I provide consultations to state mental health and correctional systems on safety and delivery of mental health services.

From 1998 – 2007, I served as statewide (b)(6) for Massachusetts Department of Correction (DOC) facilities and as a member of the (b)(6) for health care services provided by UMMS to DOC. My responsibilities included supervision of all licensed mental health providers and oversight of all mental health services provided to inmates of Massachusetts DOC facilities, including patients at Bridgewater State Hospital, the state's secure forensic psychiatric facility. Among my responsibilities prior to 1998, I served as co-(b)(6) and as (b)(6) at (b)(6) with oversight of a court evaluation unit and forensic consultation program.

I am a (b)(6) of the American Psychiatric Association and board certified in General Psychiatry and Forensic Psychiatry. My publications include over fifty peer-reviewed journal articles, book chapters, and other publications. I am former (b)(6) of the Journal of the American Academy of Psychiatry and the Law, and I continue to serve as a (b)(6) (b)(6) for several journals, including the American Journal of Psychiatry.

METHOD OF REVIEW

1.  Site visit:

    I spent full days at ECDC on May 23 and 24, 2012, and a half day on May 25, 2012. I toured many areas of the facility, including Units 3, 9, 10, which house ICE detainees, and the medical unit.

2. Interviews:
   a. I participated in group meetings with ECDC clinical and custody administrators at the start and end of the three day site visit;
   b. I met and spoke privately with detainees, both individually and in groups, on Units 9 and 10;
   c. Dr. (b)(6) the primary care physician with our survey team, and I met for over an hour with (b)(6) RN, BSN, who serves as director of the medical unit, and then with Dr. (b)(6) the family physician in charge of Doctors' Care Physicians, P.C., which provides all health care services at ECDC; and
   d. I spoke with custody and clinical staff during visits to housing units, the segregation unit, and the medical unit.

3. Document reviews: I reviewed all documents provided by CRCL and additional documents provided at ECDC, including those from the following categories:
   a. Complaints by detainees and their advocates;
   b. Patient records of complainants and others, including those described in Appendix A of this report;
   c. Policies and procedures, including the ECDC Medical Unit Policy and Procedure Manual;
   d. A list of all detainees in the following categories:
      i. currently followed for mental health problems;
      ii. currently on psychotropic medications;
      iii. on suicide watch between 1/1/12 and 5/22/12; and
      iv. referred to CED Mental Health Center, which is the county mental health service provider, between 11/1/11 and 5/21/12;
   e. ICE Detention Inspection Form Worksheets for ECDC from August, 2010 and July, 2011; and
   f. Mental Health Training materials.


EXECUTIVE SUMMARY

I received full cooperation from all staff at ECDC during this site visit. They provided me with unrestricted access to detainees, documents, medical records, and all parts of the facility. I met privately with detainees wherever and whenever I wanted.

Consultative reviews such as this always focus on things that need change. I also encountered strengths and positive findings at ECDC, some of which I describe below. The bulk of this report, however, responds to the request to address conditions and practices in need of improvement or enhancement.

Without exception, the clinical staff members that I met appeared dedicated and well-intentioned. In addition, clinical and correctional administrators generally acknowledged the need for the changes identified in this report, expressed interest in making those changes, and solicited feedback and recommendations. Many of the current shortcomings in services arise

primarily (b)(5)

(b)(5)

The willingness of clinical and correctional leadership to address current deficiencies bodes well for making needed improvements to the clinical program.

(b)(5)

Broad areas for improvement identified during this survey include the following:

(b)(5)

Addressing these concerns will likely have implications (b)(5)

(b)(5)

OVERVIEW

ECDC provides services to ICE detainees under an Intergovernmental Agreement with the U.S. Marshals Service. The facility has a capacity of 879, and it has not gone over capacity in at least the last 18 years. ECDC averages 350 male ICE detainees and usually has between 300 and 375. At the start of this site visit, ECDC had 325 ICE detainees and a total census of 749. Overall, the facility averages about 12,000 receptions per year, and approximately 25% of their non-ICE detainees are pretrial. County inmates have an average length of stay of 49 days.

ECDC has three 120 bed general population units for its ICE detainees. A 12 cell segregation unit, which can have double bunking, serves both the detainee and inmate population. Disciplinary segregation can last 30 to 60 days, and administrative segregation can last longer. The segregation unit officer could not recall any ICE detainees staying more than 30 days in segregation.

Since 2005, medical, dental, and mental health services at ECDC have been provided under a contract with Doctors' Care Physicians, P.C., a private entity owned by (b)(6)                M.D., a local family practitioner. Dr. (b)(6)    omes to the facility on an as needed basis, but he can review entries in the electronic medical record from off-site. A nurse practitioner works every Tuesday. The health services administrator (b)(6)          s an RN who takes call 24:7. Other staff include (b)(7)(E) dditional full-time RNs, several LPNs, a laboratory technician, a radiology technician, and several unlicensed medical assistants. The facility has 24:7 staffing, but no RN on-site from 6 p.m. until 7 a.m.. There are no medical records or clerical staff.

MENTAL HEALTH CARE IN ETOWAH COUNTY DETENTION CENTER

All new arrivals at the facility undergo a medical and mental health reception screen in the booking area before proceeding to one of the cellblock units. An RN, LPN, or a medical assistant (e.g., an unlicensed LPN student) typically conducts the screen, which takes place in a small room without a door in the booking area. Two individuals can sit immediately adjacent to each other on one side of a counter for their screening. They have no separation or partition for sound or sight privacy.

Within 14 days of arrival, an RN conducts a more detailed medical and mental health intake screening. If a new detainee has positive mental health findings on their reception screen, they reportedly have their intake screening done almost immediately. In some medical records that I reviewed, I found instances in which the intake screening took place within 24 hours of a positive reception screen, and in all cases less than 72 hours.

Individuals with positive mental health intake screens are referred for a "mental health evaluation [full]." I also found instances in which these occurred within 24 hours of a positive intake screen or of a significant finding on the initial reception screen.

ECDC has had only one individual designated as their mental health staff person. This individual (b)(6)    ecently stopped working at the facility. She was an unlicensed, "community

mental health officer" with a bachelor's degree.  She helped to train a radiology technician to function as her backup mental health staff person, and the radiology technician now functions as the only designated mental health staff person at the facility.  One or the other of these two individuals have conducted all of the mental health assessments and interventions at the facility.  The only exception has been rare instances in which detainees have been referred for evaluation or services from CED Mental Health Center, a community mental health provider that serves the counties of Cherokee, Etowah, and Dekalb.  The almost exclusive indication for referral to CED has been self-injurious behavior or significant threats of self-harm.  Until recently, detainees had to go to the CED community office for services.  A CED therapist can now come to ECDC to see patients, but patients still must go to CED to see a psychiatrist.  Among the records that I reviewed, I found only one individual who had seen a CED therapist or psychiatrist.  According to ECDC statistics, between 11/1/2011 and 5/21/2012, three individuals had a total of nine appointments with staff from CED.

Dr. (b)(6) prescribes all of the psychotropic medications used at ECDC.  He reads the notes and relies on the assessments of his mental health staff, but he does not see patients himself as part of prescribing their psychotropic medications.  He typically continues psychotropic medications that a detainee was taking on arrival at the facility, but he rarely starts new psychotropic medications other than SSRIs (selective serotonin reuptake inhibitors). (b)(6) and now the radiology technician, decide whether to refer a detainee to Dr. (b)(6) If they determine that a detainee has a depression due to "situational" factors, they will follow the detainee themselves rather than making a referral.  In one chart that I reviewed of a patient with a serious psychotic disorder (see discussion regarding Patient (b)(6) n Appendix A), Dr. (b)(6) started a prescription for an antipsychotic medication after the detainee had a psychiatric assessment done by Dr. (b)(6) at CED.  Psychotropic medication prescriptions cover 180 days before they must be renewed.  The facility uses an electronic MAR (medical administration record), and Dr. (b)(6) receives notification of any medication refusal by the patient. (b)(6)
(b)(6)                                                                                  no involuntary medications have been administered at least since 2005.

The facility uses a generic "consent to receive psychiatric medications" form.  This single form covers "antidepressant, antipsychotic, anxiolytic and mood stabilizing medications." (b)(5)
(b)(5)


(b)(5)                                                    As noted, however, Dr. (b)(6) rescribes the psychotropic medications at ECDC, but he does not meet personally with the patients.

Detainees can put written requests to see mental health in a sick-call box on each unit.  These requests are gathered and reviewed by an RN six days a week, but not on Saturday.  Mental health requests go to the designated mental health staff person, either (b)(6) r the radiology technician, for triage.

---

[1] The names and alien number for detainees are not contained in the body of this report to protect the privacy of these individuals.  Their names and alien numbers are included in Appendix B so this report can be shared without the appendix containing their personally identifying information (PII).

All mental health appointments take place either in the medical unit (usually in the x-ray room, which has a large plexiglass window in the door) or in the conference room near the medical unit. Detainees are brought to the medical unit in handcuffs, but the cuffs are usually removed when clinical staff see the patient.

At the time of this visit, ECDC had 25 detainees on the active mental health caseload, all of whom were on psychotropic medication. Detainees who need psychiatric hospitalization would go to Mountain Hospital in Gadsden, but no detainee has been hospitalized at least since 2005. Ms. (b)(6) could not recall this ever happening.

ECDC has had no suicides since at least 2005 and only three detainees on suicide watch between 1/1/12 and 5/22/12. All patients are placed in a suicide safety smock for the duration of their suicide watch. Patients are either on a constant or 15 minute watch. A suicide assessment takes place every day in the medical unit, once a day for five days after the patient returns to general population, once a week for two weeks after that, and then monthly for as long as the patient remains in the facility.

Med 5, adjacent to the nurses' station, is the main cell used for suicide watch. The wall between Med 5 and the nurses' station has a large window. (b)(5)



Every Monday morning, the medical unit director and the designated mental health staff person meet with facility administration and representatives from the programming and substance abuse staff. Substance abuse services and treatment plans are separate from the medical and mental health services and treatment plans. A monthly meeting takes place that includes the medical unit director, Dr. (b)(6) and all of the registered nurses. The medical unit director and Dr. (b)(6) also have a quarterly meeting with facility administration. The designated mental health staff person does not participate in the monthly or quarterly meetings.

The segregation unit does not have an officer stationed on it. Instead, an officer mans a control room that does not have visibility or continuous sound monitoring of the unit. Inmates or detainees have call buttons in their cells that turn on a light in the control room to get the attention of the officer. The officer can then activate an intercom to communicate with the person in the cell. The officer, however, conducts regular rounds on the segregation unit and on two other units, Unit 1 for mental health inmates and Unit 2 for high-security inmates. Units 1and 2 do not house detainees. At the time of this visit, the segregation unit, Unit 1, and Unit 2 had populations of 9, 20, and 17, respectively. Rounds on the segregation unit include a security check, which consists of the officer observing the inmate or detainee through the cell door. If the cell occupant is in bed or under his blanket, the officer rattles the door to make sure that the inmate moves. Officer rounds can last for 10-15 minutes and occur every half hour. During this

time, no one monitors the control room, and while the officer is on Units 1 and 2, residents of the segregation unit have no way to contact staff until the officer returns to the control room and notices the lit call button on the control panel.

A nurse, usually an LPN, administers medications on each unit twice a day, usually at 4 a.m. and 4 p.m. During the 4 a.m. rounds, the nurse asks each inmate or detainee whether they are having mental health problems or want to see someone from mental health. These welfare checks include all cell occupants. The expectation is that the nurse will wake up inmates and detainees for the welfare check regardless of whether they have a medication to receive. An officer accompanies the nurse who administers medications on the segregation unit. According to the officer, and the segregation logbook, medication administration on the segregation unit takes approximately 15 minutes.

Detainees with whom I met, spoke favorably about the nurses, especially the nurses who do the medication passes. They consistently reported, however, that they have no access to a psychiatrist. Some appeared to have significant mental health significant unaddressed mental health issues (see Appendix A).


ANALYSIS AND RECOMMENDATIONS:

**Overarching Rationale:** ICE's 2000 National Detention Standards (NDS) state that "[a]ll detainees shall have access to medical services that promote detainee health and general well-being." ICE's Performance-Based National Detention Standards 2011 (PBNDS 2011) require that "detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services." Non-dedicated IGSA facilities also "must…meet or exceed the intent represented by" the requirement that "Medical facilities within the detention facility shall achieve and maintain current accreditation with the standards of the National Commission on Correctional Health Care (NCCHC), and shall maintain compliance with those standards."

These standards have relevance to all of the recommendations below. They provide broad, additional support to the other more focused rationales for the numbered recommendations that follow.

**1.** (b)(5)

**Rationale:** (b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

**2.** (b)(5)

**Rationale:** (b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5);(b)(6)

(b)(5)

**3.** (b)(5)

**Rationale:** (b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

**4.** (b)(5)

**Rationale:** (b)(5)

(b)(5)

**5.** (b)(5)

**Rationale:** (b)(5)

(b)(5)

(b)(5)

(b)(5)

**6.** (b)(5)

**Rationale:** (b)(5)

(b)(5)

(b)(5)

**7.** (b)(5)

**Rationale:** (b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

SUMMARY OF RECOMMENDATIONS:

(b)(5)

**1.**

**2.**

**3.**



4.

5.

6.

7.

Appendix A
Summaries of Selected Case Reviews

Several general observations apply across all medical records that I reviewed.

(b)(5)

(b)(5);(b)(6)

1. Patient (b)(6)

(b)(5);(b)(6)

(b)(5);(b)(6)

2. Patient (b)(6)

(b)(5);(b)(6)

3. Patient (b)(6)

(b)(5);(b)(6)

4. Patient (b)(6)

(b)(5);(b)(6)

5. Patient (b)(6)

(b)(5);(b)(6)

6. Patient (b)(6)

(b)(5);(b)(6)

(b)(5);(b)(6)

(b)(5);(b)(6)

Appendix B

Names and Alien Numbers for Detainee Patients

Patient (b)(6)
Patient
Patient
Patient
Patient
Patient


(b)(6) **MD, MPH**

(b)(6)
**Tumwater, Washington 98501**

(b)(6)

August 4, 2012

# I. Introduction

This report contains my medical opinions regarding the care provided to detainees at the Etowah County Detention Center (ECDC), in Gadsden, Alabama.[1]  It is produced at the request of the U.S. Department of Homeland Security (DHS), Office for Civil Rights and Civil Liberties (CRCL), as part of CRCL's investigation of several complaints regarding ECDC.[2]

My report is based on review of complaint documents provided by CRCL and a site visit on May 23, 24, and 25, 2012.  During the site visit, I toured parts of the facility, met with detainees and custody and health care staff, and reviewed both specifically selected and randomly chosen detainee medical records.[3]  I was joined in the visit by, among others, three additional subject matter experts:  Dr. (b)(6) MD, a psychiatrist; Ms. (b)(6) an environmental health and safety consultant; and Ms. (b)(6) a corrections consultant.  As such, I did not review issues strictly pertaining to these three operational areas.  However, I did review issues that might generally affect one of these areas as well as medical and dental healthcare.

I analyzed the allegations in the complaints, as well as other ECDC activities I observed, for their adherence to ICE's National Detention Standards 2000 (NDS),[4] which are the standards that are currently applicable to ECDC.  In addition, because ECDC is accredited by the National Commission on Correctional Health Care (NCCHC), I evaluated these activities based on NCCHC's Standards for Health Services in Jails 2008.(b)(5)
(b)(5)

(b)(5)
I also included observations based on the PBNDS 2011.

In general, my focus in this report is on issues that may impact patient safety.  A health care system is not safe for patients if it fails to produce the health outcomes desired by the patient either through a failure to create or execute the correct medical plan.  Under this broad definition

---

[1] The details of my professional qualifications are set forth in my curriculum vitae, which is attached to this report as Appendix B.
[2] The specific complaints that are part of this investigation are:  11-11-ICE-0291, 11-12-ICE-0316, 11-12-ICE-0318, 11-10-ICE-0260, 11-12-ICE-0325, 12-01-ICE-0005, 12-01-ICE-0010, Contact-DHS-12-0320, and 12-06-ICE-0133.
[3] To the extent I refer to any specific detainees or cases in this report, I have not included any personally identifiable information about them.  Instead, the names and alien numbers for each person I reference are included in Appendix A.
[4] Except where noted, I am referring to the NDS Medical Care standard.

of patient safety, a health care system would be unsafe if it failed, for example, to provide access to care or patient privacy. Identifying potential inefficiencies where patient safety is not at risk is not a focus of my report. However, where I noticed an inefficiency in the course of my work, I have reported it and labeled it as "technical assistance." I have also labeled as "technical assistance" suggestions for possible ways of addressing formal "recommendations." In either case, "technical assistance" comments are simply meant to be helpful and are technically outside the formal scope of my report. For patient safety concerns, I assigned a rating (Level I, II, or III) to provide some sense of the relative importance of the problem. The rating is based on both the seriousness of the issue as well as how frequently it is likely to be encountered, with Level I designating those problems which require the most urgent attention.

The detention facility is operated by Etowah County, Alabama. Health care at ECDC is provided under contract with (b)(6) a primary care practice in Gadsden. (b)(6) (b)(6) is responsible for all medical, dental, and mental health care. Some mental health care is provided by CED, a three-county public mental health cooperative.

## II. Summary

Within the limits of my examination, the health care operation at ECDC is generally well-run. Of particular importance, the medical director, Dr. (b)(6) is actively involved in setting policy and overseeing all aspects of health care. The health services administrator (HSA), Ms. (b)(6) strives for good patient outcomes. All other health care staff I met seemed devoted to their work and cared about their patients' welfare. Detainees did not complain about staff attitudes and in fact detainees volunteered the names of three staff members who are particularly helpful (I have shared their names with ECDC). (b)(5)

(b)(5);(b)(6)

Nonetheless, I did identify a number of operational problems. (b)(5)

(b)(5)

(b)(5)

Given the open and cooperative attitude of custody and health care leadership personnel at ECDC, the foundation of an otherwise good operation, and the speed with which staff made some suggested changes to operations before our visit was even completed, I believe ECDC can be successful in correcting the problems identified in this report.

## III. Complaint-Specific Concerns

### CRCL Case 11-11-ICE-0291

Allegation: The morning medication pass occurs around 03:00 am which interferes with sleep.

Findings: (b)(5)
(b)(5)

Conclusions: (b)(5)
(b)(5)

### CRCL Case 11-12-ICE-0316

Allegation: There are not enough professional medical staff in relation to the detainee population and their needs.

Findings: My review of this allegation was limited to medical and dental care.  There are, unfortunately, no generally accepted standards for staffing levels in correctional health care. Staffing level are generally judged indirectly by examining whether service delivery is adequate; the limitation of this approach, however, is that service delivery may be inadequate for reasons other than lack of enough staff. (b)(5)
(b)(5)

Conclusion: (b)(5)
(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

DHS-001-HQFO-00698-000093

Allegation: An unnamed detainee who reported being sexually assaulted at a previous facility received no HIV testing despite asking.

Findings: I was unable to investigate this allegation directly due to the lack of identifiers of the detainee in question. I found no cases of other detainees asking for HIV tests nor cases of detainees asking for other medically necessary testing who were refused.

Conclusions: I was unable to substantiate or disprove this allegation.

### CRCL Case 11-12-ICE-0318

Allegation: The detainee was told that he could only have medically necessary medications if he purchased them.

Findings: (b)(5)
(b)(5)

Conclusion: (b)(5)
(b)(5)

### CRCL Case 12-01-ICE-0010

This case was already investigated by IHSC. Please refer to their conclusions contained in the IHSC report of 2/13/12.

## IV. Assessment of Medical Care Delivery Systems

**1.** (b)(5)

According to NDS III.F, after a detainee submits a sick call request slip (SCR) for medical care, "*The health care provider will review the request slips and determine when the detainee will be seen. All detainees…will have access to sick call.*" Implicit in this standard is that, in fact, the detainee will be <u>seen</u>. NCCHC J-E-07 has a similar provision. PBNDS 2011 4.3.V.Q.4 has similar wording, adding, "Medical personnel shall review the request slips and determine when the detainee shall be seen based on acuity of the problem." The term "when" is used here, not "if." A written response can be appropriate for requests that are essentially administrative in nature, such as inquiries about scheduling, requests for medical records, etc. However, any SCR evoking a symptom or clinical need must result in a face-to-face encounter with a qualified health care professional, regardless of how benign the complaint may seem.

(b)(5)

(b)(5)

(b)(5)

**RECOMMENDATION 1.1:** (b)(5)

(b)(5)

**RECOMMENDATION 1.2:** (b)(6)

(b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

**2** (b)(5)

(b)(5)

**RECOMMENDATION 2.1:** (b)(5)

(b)(5)

TECHNICAL ASSISTANCE RECOMMENDATION 2.2: (b)(5)

(b)(5)

---

(b)(5)

(b)(5)

(b)(5)

**3** (b)(5)

(b)(5)

(b)(5)

**RECOMMENDATION 3.1:** (b)(5)

(b)(5)

TECHNICAL ASSISTANCE RECOMMENDATION 3.2: (b)(5)

(b)(5)

TECHNICAL ASSISTANCE RECOMMENDATION 3.3: (b)(5)

(b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

**4.** (b)(5)

(b)(5)

(b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

**RECOMMENDATION 4.1:** (b)(5)

(b)(5)

**RECOMMENDATION 4.2:** (b)(5)

(b)(5)

**5.** (b)(5)

(b)(5)

**RECOMMENDATION 5.1:** (b)(5)

(b)(5)

**6.** (b)(5)

(b)(5)

(b)(5)

(b)(5)

(b)(5)

**RECOMMENDATION 6.1:** (b)(5)

(b)(5)

**RECOMMENDATION 6.2:** (b)(5)

(b)(5)

(b)(5);(b)(6)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

(b)(5)

**7.** (b)(5)

(b)(5)

(b)(5)

**RECOMMENDATION 7.1** (b)(5)

(b)(5)

**8.** (b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

(b)(5)

**RECOMMENDATION 8.1:** (b)(5)

(b)(5)

**9.** (b)(5)

(b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

(b)(5)

(b)(5)

**RECOMMENDATION 9.1:** (b)(5)

(b)(5)

**RECOMMENDATION 9.2:** (b)(5)

(b)(5)

**RECOMMENDATION 9.3:** (b)(5)

(b)(5)

**RECOMMENDATION 9.4:** (b)(5)

(b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

DHS-001-HQFO-00698-000104

(b)(5)

## 10. Technical assistance: (b)(5)

(b)(5)

(b)(5)

(b)(5)

TECHNICAL ASSISTANCE RECOMMENDATION 10.1: (b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

## V. Summary of Recommendations

**RECOMMENDATION 1.1:** (b)(5)

(b)(5)

**RECOMMENDATION 1.2:** (b)(5)

(b)(5)

**RECOMMENDATION 2.1:** (b)(5)

(b)(5)

**RECOMMENDATION 3.1:** (b)(5)

(b)(5)

**RECOMMENDATION 4.1** (b)(5)

(b)(5)

**RECOMMENDATION 4.2:** (b)(5)

(b)(5)

**RECOMMENDATION 5.1:** (b)(5)

(b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

(b)(5)

## RECOMMENDATION 6.1: (b)(5)

(b)(5)

## RECOMMENDATION 6.2: (b)(5)

(b)(5)

## RECOMMENDATION 7.1: (b)(5)

(b)(5)

## RECOMMENDATION 8.1: (b)(5)

(b)(5)

## RECOMMENDATION 9.1: (b)(5)

(b)(5)

## RECOMMENDATION 9.2: (b)(5)

(b)(5)

## RECOMMENDATION 9.3: (b)(5)

(b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

(b)(5)

**RECOMMENDATION 9.4:** (b)(5)

(b)(5)

# VI. Summary of Technical Assistance Recommendations

TECHNICAL ASSISTANCE RECOMMENDATION 2.2: (b)(5)

(b)(5)

(b)(5)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

(b)(5)

TECHNICAL ASSISTANCE RECOMMENDATION 3.2: (b)(5)

(b)(5)

TECHNICAL ASSISTANCE RECOMMENDATION 3.3: (b)(5)

(b)(5)

TECHNICAL ASSISTANCE RECOMMENDATION 10.1: (b)(5)

(b)(5)

(b)(6)

Attachment: *Curriculum Vitae*



CV - (b)(6) docx

*Protected by the Attorney Work Product and Deliberative Process Privileges*

Appendix A

(b)(6)

*Protected by the Attorney Work Product and Deliberative Process Privileges*

**Attachment C**
**CRCL Etowah County Jail Proposed Improvements**

The following is a consolidated list of actionable facility-related recommendations based on CRCL site visits conducted in 2006, 2008, and 2012. CRCL continues to get complaints on these issues.

Medical:

(b)(5)

(b)(5)

## Recreation

(b)(5)

## Mental Health

(b)(5)

(b)(5)

## Grievances

(b)(5)

## Overall Sanitation

(b)(5)

(b)(5)

Segregation

(b)(5)

Contract Related Recommendations:

(b)(5)

Attachment A

Open Complaints May 2012 to Present



| Row | State Sender City | Status View State | Complaint Number | Date to CRCL | Last Action Date | Last Action Situation | Last Action Incident Location |
|-----|-----|-----|-----|-----|-----|-----|-----|

Behalf View — Summary — Issue

1   Open   Complaint   13-04-ICE-0111   01/07/2013   05/10/2013   Short Form   (b)(6)

On January 7, 2013, CRCL received correspondence from (b)(6) (b)(6) an ICE detainee at Etowah County Detention Center in Gadsden, Alabama. Mr. (b)(6) alleges that ICE ignores his transfer requests because he is "claustrophobic and has depression," and that his health has suffered because he is not provided a diet in accordance with his religion and "physical condition." Mr. (b)(6) further alleges that staff ignored his request for a medical exam and will not provide herbal medicine that meets his diet. Mr (b)(6) also alleges the he was arrested without a warrant by ICE on November 2, 2011. He states that ICE transferred him from state to state without his agreement, and that "all jails" refused him herbal medicine. Mr. (b)(6) also alleges that he was arrested without a warrant by ICE on November 2, 2011. Mr. (b)(6) alleges that when he got his final order notice, he waived his appeal. He also states that his maximum removal period has now lapsed and he is "stateless" because he arrived here from the USSR and the "Russian Consul denied all requests for [his] travel."     Conditions of Detention
    Immigration detention   Etowah County Jail   Gadsden   Alabama - AL

2   Open   Complaint   13-05-ICE-0113   02/20/2013   05/10/2013   Short Form   (b)(6)

(b)(6)   On February 20, 2013, CRCL received standard mail correspondence dated January 5, 2013, from (b)(6) an ICE detainee at Etowah County Detention Center in Gadsden, Alabama. Mr. (b)(6) alleges inappropriate medical care at multiple ICE facilities for his back pain. The facilities involved in his allegations include: Jenna/Lasalle Detention Facility in Jena, Louisiana, Tensas Parish Detention Center in Waterproof, Louisiana, and Etowah County Detention Center in Gadsden, Alabama. He states that on December 13, 2013 at Jenna/Lasalle Detention Facility (JENA) in Louisiana, he hurt his back, and asked to see medical personnel on several occasions between December 16-21. He further alleges that the manner in which he was transported to other facilities exacerbated his back pain. He states that eventually sometime between December 21 and 26 he was seen by a nurse named (b)(6) who prescribed him Ibuprofen. He states his back pain worsened between December 26 and 31 until he could "hardly walk." He states that he could not walk for almost two weeks, used a wheelchair, the pain was so intense that he had difficulty making it to the bathroom and that his meals were brought to his bunk. He states that on January 5, 2013 he saw a doctor who diagnosed him with arthritis and provided "two injections and twelve pills a day for a week." He states that he continues to experience "constant pain". He says on January 23, he refused to be deported and

alleges officers placed him in handcuffs and "twisted and jerked" his back aggravating his injury. EARM records confirm his transportation to the different facilities, as well as the incident of his refusal to be deported on 1/23/13. (Note EARM records also show he was transferred from Etowah to Jenna/Lasalle on December 13, 2012, from Jenna/Lasalle he was sent to Tensas Parish on January 23, 2013, and from Tensas Parish to Etowah on January 30, 2013.)   Medical/Mental Health Care    Immigration detention

3    Open    Complaint    13-06-ICE-0133 03/15/2013    07/29/2013    Short Form    (b)(6)
(b)(6)                                    "On March 15, 2013, CRCL received email correspondence from DHS OIG regarding (b)(6)                          an ICE detainee currently at the Tensas Parish Detention Center in Waterproof, Louisiana. In a letter dated February 15, 2013, Mr.(b)(6) (b)(6)   states that he has been diagnosed with ""decreased arterial blood flow"" in his left leg, which has caused him sharp pain and numbness. He claims that he was scheduled to have surgery to remove the blockage (he states that ICE scheduled the surgery while he was detained at the Etowah County Detention Center). Mr.(b)(6)            claims that he has not yet received the surgery because he was transferred from Etowah to LaSalle Detention Center in order to be removed.

According to EARM, ICE attempted to remove Mr. (b)(6)             on January 23, 2013 and February 13, 2013. Mr. (b)(6)         failed to comply with his removal, however, and has since been transferred to Tensas, where he is currently being held."Medical/Mental Health Care    Immigration detention    Tensas Parish Det. Cntr. Waterproof    Louisiana - LA

4    Open    Complaint    13-10-ICE-0268 07/24/2013    09/30/2013    Short Form    (b)(6)
(b)(6)                          "On July 24, 2013 CRCL received by email an informal referral from DHS OIG of a submission to the DHS OIG Public website from private attorney (b)(6)                     on behalf of his client, Mr(b)(6)                        , The submission , received by the OIG on July 18, 2013, alleges that the day before, July 17, 2013,  at John F. Kennedy International (JFK) Airport in New York, New York, Mr(b)(6)       ""refused"" to board an aircraft to be removed and  was then physically assaulted by four ICE officers. According to the attorney, Mr.(b)(6)    was to have been placed on a flight to depart at 5:40 p.m. on July 17, 2013. He allegedly refused to board the plane, at which time he was ""smashed into the side wall, knocked to the ground, beaten with hands and feet"" by four officers. One officer of Asian descent ""put his boot on his face and smashed his face into the ground"". The attorney alleges Mr.(b)(6)     had the officer's footprint imprinted on the right side of his face and that ""he was also hit with either a gun butt or flashlight on the side of the skull. He was bleeding from the mouth and the nose at the end of the beating. He was in such bad condition he was taken to Jamaica Hospital"". Mr.(b)(6)         states that he has ""photos of [Mr(b)(6)      condition"".

Notes: According to EARM records, Mr. (b)(6)   was transferred to Hudson County Jail in Kearny, New Jersey on July 17, 2013, then to York County Jail, Pennsylvania on July 22, 2013, then to LaSalle Detention Facility in Oakdale, Louisiana July 23, 2013, and then to Etowah County Detention Center in Gadsden, Alabama on July 31, 2013. Mr(b)(6)     is currently in ICE custody.

An EARM record reports that Mr. (b)(6) contacted the ICE ERO Community and Detainee Helpline (CDH) on July 19, 2013 to report that he was physically assaulted by ICE officers as a result of his refusal to board the aircraft for removal. That EARM record does not specify the date of the alleged assault. No EARM record states that Mr. (b)(6) was hospitalized.

The employing component(s) of the officers involved in the alleged incident were not identified in the submission to the OIG. Based on the aforementioned EARM record and the allegations, it appears the allegations involve ICE officers." Excessive or Inappropriate Use of Force  Immigration detention  John F. Kennedy International Airport  New York  New York - NY

5    Open    Complaint    13-11-ICE-0299 09/03/2013    12/05/2013    Litigation Hold (b)(6)
(b)(6)    "On September 3, 2013, CRCL received postal mail correspondence from (b)(6)
(b)(6)    an ICE detainee at Etowah County Jail (""Etowah"") in Gadsden, Alabama. In corerspondence dtaed August 22, 2013, Mr.(b)(6) states that he has a pending federal civil case against Etowah for inadequate dental care.(b)(6) U.S. District Court for the Northern District of Alabama (b)(6)    Specifically, Mr (b)(6) alleges that he waited seven months to get treated for a hole in his tooth and several cavities that need to be fixed. Mr.(b)(6) alleges that Etowah obstructed justice because a court order dated July 15, 2013, was returned by the Postal Service with a notation that Mr.(b)(6) had been released from detention, thereby putting his case at risk for dismissal. Based on subsequent filings by Mr.(b)(6) ndicating he remained in detention, and the order was re-sent by the court. Mr(b)(6) also has two other civil cases pending against Etowah. He claims that Etowah is trying to sabotage his civil cases.  He alleges that he is being punished for pursuing his civil rights and civil liberties because he filed a motion to expedite one of his cases and the court has yet to order ICE to ""show cause.""

Additionally, Mr.(b)(6) alleges that he has been denied medical care for a skin irritation he began to experience on May 23, 2013. He states that he has been given medication(b)(6)
(b)(6)    M(b)(6)    notes that(b)(6)    He writes, "(b)(6)
(b)(6)    Due Process    Immigration detention  Etowah County Jail    Gadsden
       Alabama - AL

6    Open    Complaint    13-11-ICE-0292 08/14/2013    06/20/2014    Retained in CRCL
     (b)(6)    (b)(6)    "San Diego Master Complaints:
13-04-ICE-0132 (Garcia), 14-05-ICE-0116, 13-11-ICE-0292, 14-02-ICE-0032

14-05-ICE-0100, 14-06-ICE-0132

On August 14, 2013, CRCL received correspondence by postal mail from Mr.(b)(6)    an ICE detainee (b)(6)    at the San Diego CCA Contract Detention Facility, aka Otay Mesa Detention Facility, in San Diego, California. Mr.(b)(6)    alleges that the facility's indigent status policy and

practices deny him and other detainees adequate legal access. He indicates that he cannot afford standard postage fees. He claims that the Corrrections Corporation of America (CCA) Business Office often delays the withdrawal of funds from the trust accounts of detainees and does not properly apply credit or deductions to those accounts. He states that such actions impede detainees' access to the courts and prevent detainees from filing briefs in a timely manner.

According to a ""Request for Indigent Status"" form enclosed with his correspondence, the San Diego CCA facility requires that ICE detainees meet the following criteria to qualify for indigent status: a detainee's account balance, funds, and physical possession of liquid assets must equal $15.00 or less for 30 days prior to the detainee's request for supplies.

According to Mr. (b)(5) ccount statement (included in correspondence) between the dates of 07/23/2013 and 07/26/2013, his balance was below $15.00.

CRCL received previous correspondence from Mr. (b)(6) where he raised unrelated allegations against San Diego Contract Detention Facility - CCA. In closed complaint 10-10-ICE-0153, he alleges racial and national origin discrimination as well as various condition of detention deficiencies. In information layer matter Contact-DHS-12-0674, Mr. (b)(6) raises separate legal access allegations.

EARM indicates as of 09/03/2013, Mr. (b)(6) s in custody in Etowah County Jail in Gadsden, Alabama.
"       Legal Access     Immigration detention  San Diego CCA Correctional Facility      San Diego California - CA

7       Open    Complaint       14-01-ICE-0009 10/28/2013       11/28/2013      Short Form      (b)(6)
(b)(6)              "On October 28, 2013, CRCL received postal mail from (b)(6)                      , an
ICE detainee at Etowah County Jail in Gadsden, Alabama. In a letter dated October 6, 2013, Mr. (b)(6)
alleges that on October 3, 2013, the facility violated HIPPA by allowing an officer to sit in on his ""doctor and patient meetings."" Mr. (b)(6) claims that he expressed concern about this to an intake nurse who informed him it was for ""security reasons,"" although Mr. (b)(6) says that his hands were chained to his waist, and both legs were chained.

Additionally, Mr. (b)(6) alleges that on September 17, 2013, while being escorted to a medical clinic, his hands and legs were both chained and he did not receive assistance into the van. He writes, ""As I climbed into the van, I felt on the van's floor hitting my right knee, which I have been suffering from because of another fall at one of your facilities in June 2012."" Mr. (b)(6) adds, ""The nurse saw me on September 18, 2013 who promised referring the matter to a Specialist but no further action has been taken..."" and claims, ""indifference and negligence [by the facility] has subjected me to bullying, harassment; emotional, verbal and psychological torture and abuse from other fellow detainees."""



Medical/Mental Health Care    Immigration detention  Etowah County Jail    Gadsden
Alabama - AL

8     Open    Complaint        14-02-ICE-0020 11/06/2013      04/02/2014     Short Form    (b)(6)
(b)(6)                            "On November 6, 2013 CRCL received postal mail correspondence from
(b)(6)          of the organization Families for Freedom  (FFF) on behalf of ICE detainee (b)(6)
(b)(6)                In a letter dated October 29, 2013, (FFF) alleges that ICE officers used
excessive force against M(b)(6)       on October 2, 2013, to obtain his fingerprints on travel documents
at Etowah County Detention Center (ECDC) in Gadsden, Alabama, and that the facility did not provide
adequate medical treatment for injuries he sustained from that incident.


Enclosed is a copy of an October 2, 2013 letter from Mr. (b)(6)       to DHS Office of Inspector General,
describing the allegations. He states that an ICE officer handcuffed him and escorted him from his
housing unit to an ICE Office at ECDC. The ICE Officer reportedly asked Mr (b)(6)       o sign travel
documents. When Mr (b)(6)       replied that he had an appeal pending in court, the officer returned
with three ICE Deportation Officers.


All four Officers allegedly used aggressive force toward Mr. (b)(6)       to try to get his fingerprints on the
documents, while Mr. (b)(6)       was handcuffed. Mr. (b)(6)       states that he had his thumbs locked
while in handcuffs and that the ICE Officers forcefully grabbed on his arms to place his fingerprints on a
document. He also states that he struggled due to the force an hit his head against the wall due to him
keeping his thumbs locked in a fist. Due to the twisting of his arms, he states he has abrasions to both
arms.


After struggling with the officers, he was taken to the facility's medical unit for examination. En route to
the medical unit the ICE Officer who took him there said that the incident had been there supervisors'
call. When medical staff asked what had happened, the ICE officer said, ""We tried to force him to sign
for travel documents but he was resisting."" In his letter, Mr. (b)(6)       reports that the medical staff
treated the scrapes on his elbows, thumbs, and arms. He states that he was still experiencing pain.


In the complaint form completed on behalf of Mr. (b)(6)       by FFF states that Mr. (b)(6)       has been
""denied"" medical care and was experiencing pain in his shoulder, wrists, right arm and fingers.
According to FFF, nurses assured Mr. (b)(6)       hat they would get him an x-ray and to date he had not
received an x-ray. Mr. (b)(6)       further questions why he was handcuffed in the first place on October
2, 2013.



Notes: EARM records state that October 2, 2013, Mr (b)(6)       spouse contacted ICE CDH with regard
to the refusal to sign the document. Another October 4, 2013 entry states that Supervisory Detention

and Deportation Officers have investigated the incident. According to EARM, Mr. (b)(6) s currently detained at LaSalle Detention Facility in Jena, Louisiana, and is scheduled for removal on December 11, 2013.

The DHS Outlook Global Address List identifies (b)(6),(b)(7)(C) as an ICE Deportation Officer at ECDC. The other ICE officers named as being involved in the October 2, 2013, incident are three Deportation Officers and the one Immigration Enforcement Agent.

" Excessive or Inappropriate Use of Force  Immigration detention  Etowah County Jail  Gadsden  Alabama - AL

9  Open  Complaint  14-03-ICE-0073 12/03/2013  03/14/2014  Short Form  (b)(6)
(b)(6)  "On December 3, 2013, CRCL received postal mail correspondence from (b)(6)
(b)(6)  an ICE detainee at Etowah County Detention Center in Gadsden, Alabama, who alleges that his medical privacy rights were violated by personnel from that facility.  He states that October 31, 2013, four detainees  and two inmates, including him, were transported to a doctor's office outside the detention facility.

Mr. (b)(6)  states that while at the doctor's office, they had to discuss their medical information in the presence of correctional officers. He claims that such action constitutes a HIPPA violation of patients' privacy and also violates a provision in the ICE Detainee Handbook regarding privacy of medical information.  He further states that he and the other detainees and inmates were shackled around their wrists, their waists, and their legs during transport to the doctor's office and while at the doctor's office. They left the detention facility around 1:25p.m. and returned at 4:45p.m.

" Privacy Immigration detention  Etowah County Jail  Gadsden  Alabama - AL

10  Open  Complaint  14-03-ICE-0092 12/03/2013  05/27/2014  Short Form
(b)(6)  On December 3, 2013, CRCL received postal mail correspondence from (b)(6)  an ICE detainee at Etowah County Jail in Gadsden, Alabama. Mr. (b)(6)  alleges that on November 14, 2013, he sustained several injuries when he was forcibly fingerprinted. In his correspondence, Mr. (b)(6)  provided a statement from (b)(6)  who claims he witnessed the alleged incident, and states that Mr. (b)(6)  was not adequately treated in the medical unit for his injuries. According to EARM, Mr.  was removed on November 21, 2013.  Excessive or Inappropriate Use of Force  Immigration detention  Etowah County Jail  Gadsden  Alabama - AL

11  Open  Complaint  14-03-ICE-0055 12/03/2013  03/18/2014  Short Form
(b)(6)  Etowah County Detention Center  Etowah County Jail  On December 3, 2013, CRCL received postal mail correspondence from (b)(6)  an ICE detainee at Etowah County Jail in Gadsden, Alabama. Mr. (b)(6)  claims that county inmates are taking up law library time and resources during designated detainee-use periods, and that ICE detainees are given preferential treatment to law library resources. Mr. (b)(6)  also adds that he is not literate in writing in English, and (b)(6)  has offered to help him with his legal briefs; however, an officer "continuously obstructs" him from obtaining assistance from Mr. (b)(6)  the only

detainee Mr. (b)(6) has identified as being competent in the English language.     Legal Access
Immigration detention     Etowah County Jail     Gadsden     Alabama - AL

12     Open     Complaint     14-03-ICE-0054 12/03/2013     03/18/2014     Short Form
(b)(6)     Etowah County Detention Center     Etowah County Jail     "On December
3, 2013, CRCL received postal mail correspondence from (b)(6) an ICE
detainee at Etowah County Jail in Gadsden, Alabama. Mr. (b)(6) alleges that the facility has failed to
provide hard copies and photo copies of legal documents, and the facility impedes outgoing legal mail.
Mr. (b)(6) states that he is unable to access his previously prepared legal materials due to
incompatible computer software within the law library.

CRCL received additional allegations on February 18, 2014 from Mr. (b)(6) regarding inadequate
access to indigent mail services, which impacts his ability to send legal mail."     Legal Access
Immigration detention     Etowah County Jail     Gadsden     Alabama - AL

13     Open     Complaint     14-03-ICE-0042 12/26/2013     02/03/2014     Short Form
(b)(6)     "On December 26, 2013, CRCL received postal mail
correspondence from (b)(6) an ICE detainee at Etowah County Jail in
Gadsden, Alabama. In a letter dated December 15, 2013, Mr. (b)(6) states that when he was
detained at Sherburne County Jail in Elk River, Minnesota, he was ""severely beaten by ICE officers on
October 10, 2013, because I refuse[d] to sign,"" and ""I sent you a copy when it happened, but ICE made
sure it didn't get to the consulate..."" [Note: CRCL has no record of having received this
correspondence.]

Mr. (b)(6) attached a letter dated October 17, 2013 that he sent to the Advocates for Human Rights
in Minneapolis, Minnesota. In his correspondence, Mr. (b)(6) alleges that he had an immigration
hearing on October 10, 2013 and an ICE officer came into his holding cell and instructed him to sign
documents. Mr. (b)(6) claims that he didn't understand the documents and requested an
interpreter, but the officer denied his request, telling him that if he didn't sign the documents, he would
be forced to. Mr (b)(6) states that two additional officers entered the cell, and he again requested
an interpreter. He alleges that the three ICE officers then wrestled him to the floor and ""forcefully tried
to grab my thumbs to get my fingerprints on the documents."" He states, ""They were pushing my head
over the sink in the room. They kept trying to pry my hands open to get my fingerprints. My forced
fingerprints are on the bottom of the 'Warning for Failure to Deport document (Form I-229a), dated 10-
10-2013.'"" Mr (b)(6) adds that at one point, he was unable to breathe ""as the officers were
forcing my head down and choking me by grabbing my neck and throat.""

Mr (b)(6) states that when he felt like he was going to pass out, he bit the hand of an officer whose
hand was around his neck. That particular officer then dropped him to the floor and two or three
additional officers entered the cell and pinned him to the floor after obtaining his fingerprints. He claims
that he still experiences ""a lot of back and neck pain because of this,"" especially when he takes deep
breaths, and that he experiences headaches and blurry vision. He adds that he experienced the

following injuries from the alleged incident: numbness in his left thumb and wrist; a bruise on the inside of his mouth; a bruise on his arm; a cut lip, and elbow scrape. He alleges that he requested to see a doctor for his injuries, but was denied. "Medical/Mental Health Care    Immigration detention  Etowah County Jail    Gadsden    Alabama - AL

14    Open    Complaint    14-02-ICE-0020 01/10/2014    [(b)(6)]
[(b)(5)]    On January 10, 2014, CRCL received an informal email referral from DHS OIG [(b)(7)(E)]
of allegations from [(b)(6)] , an ICE detainee at LaSalle Detention
Facility in Jena, Louisiana. In postal mail correspondence dated December 5, 2013, Mr. [(b)(6)]
alleges that he was forcibly fingerprinted and received inadequate medical care for his alleged injuries.
Mr [(b)(6)] writes that he is experiencing pain in his right elbow, wrists, and shoulder after
allegedly being forcibly fingerprinted while at Etowah County Jail in Gadsden, Alabama. Now at LaSalle,
Mr. [(b)(6)] states that the Ibuprofen he is being given is not helping to alleviate his pain, and
that he has not received the x-ray that was supposed to be ordered when he was at Etowah. He claims
that LaSalle medical staff have told him that "an x-ray is not an emergency" and advise him to continue
taking Ibuprofen.    Medical/Mental Health Care    Immigration detention  Etowah County Jail
    Gadsden    Alabama - AL

15    Open    Complaint    14-05-ICE-0126 02/19/2014    01/14/2015    Retained in CRCL
    [(b)(6)]    On February 19, 2014 CRCL received email referral from
DHS OIG [(b)(7)(E)]    regarding correspondence dated February 15, 2014 from attorney [(b)(6)]
on behalf of [(b)(6)]    Mr. [(b)(6)] is alleging that his right to privacy was violated by
ICE with the release of a press bulletin disclosing that he sought asylum in the United States and
identifying him as [(b)(6)]    also alleges the press release made false
claim to his appeal being denied June 2012 when it was still pending at the time. EARM records show on
06/11/2012, [(b)(5)]    Mr. [(b)(6)] further
alleges that while in ICE detention he was "mistreat[ed] while in solitary, denied medical treatment,
threatened with bodily harm, and denied access to a shower for prolonged periods." Mr [(b)(6)] does not
identify a specific facility but generalizes his experiences. According to EARM records he was detained in
the following facilities in chronological order: 09.08.10 NYC Field Office, NY; 09.08.10 Varick Street SPC,
NY; 09.08.10-09.22.11 Hudson County Jail, NJ; 09.22.11-07.03.2012 Monmouth County Jail, NJ;
07.03.12-07.05.2012 Jena/Lasalle Detention, LA; 07.05.12-08.27.2012 Etowah County Jail, AL;
08.27.2012-09.25.2012 Jena/Lasalle Detention, LA; 09.25.2012-10.12.2012 Tensas Parish Detention
Center, AL; 10.12.2012-02.12.2014 Jena/Lasalle Detention, LA.    Privacy  DHS public messaging /
websites    Blog.Nola.com

16    Open    Complaint    14-06-ICE-0107 03/07/2014    04/03/2014    Short Form
    [(b)(6)]    On March 7, 2014, CRCL received postal mail correspondence
from [(b)(5)] , an ICE detainee at Etowah County Jail in Gadsden, Alabama. In a
letter dated February 20, 2014, Mr [(b)(6)] makes several allegations regarding conditions of detention
at Etowah, including high telephone fees, disrespectful officers, "bad" food, inadequaqte medical care,
lack of response to filed grievances, and restrictive access to legal documents. Mr. [(b)(6)] claims that
he was approved by medical staff to receive a new pair of shoes for better support of his left knee which
he "tore," however, his deportation officer (DO) allegedly told him he would be removed soon, so he
didn't need the shoes. Mr [(b)(6)] alleges that detainees are served expired food and milk, and that the
food served lacks variety. The letter includes signatures and alien numbers of additional Etowah ICE

detainees.    Medical/Mental Health Care    Immigration detention  Etowah County Jail
        Gadsden        Alabama - AL

17    Open    Complaint        14-06-ICE-0143 03/07/2014        09/10/2014        Litigation Hold
(b)(6)                                        On March 7, 2014 CRCL received postal mail correspondence
from Mr. (b)(6)                                    an ICE detainee transferred from Baker County Detention
Center in Macclenney, Florida to Etowah County Jail in Gadsden, Alabama, alleging that upon his and
several other detainees arriving at Etowah County Jail during booking, he realized that the floppy disks
of all of the detainees were missing from their property. Mr. (b)(6)        states that all of the detainees
have information on the floppy disks pertaining to their immigration cases. Mr. (b)(6)        alerted the ICE
officers at Etowah and the officers double checked all the luggage that came with the transportation
crew to make sure the floppy disks were either placed in a separate bag or left behind. The disks had
pictures of the detainees and their alien numbers attached to the disks as identifiers. Mr. (b)(6)        states
that before the detainees departed from Baker County Detention Center they retrieved the floppy disks
from the ICE Officers.    Conditions of Detention Immigration detention  Baker County Detention Center
        Mcclaney        Florida - FL

18    Open    Complaint        14-04-ICE-0133 01/06/2014        05/27/2014        Short Form        (b)(6)
(b)(6)                                        "On January 6, 2014, CRCL received email correspondence from
(b)(6)    on behalf of his father.(b)(6)                            , an ICE detainee at Etowah County
Jail in Gadsden, Alabama. Mr.(b)(6)    claims that Mr.(b)(6)            was forced to fingerprint
deportation documents, and refused because he had made an appeal on his case. Officers allegedly then
held him down, grabbing his ankle and wrists, causing cuts. Notes: Mr. (b)(6)            was removed
on January 9, 2014.

"    Excessive or Inappropriate Use of Force Immigration detention  Etowah County Jail
        Gadsden        Alabama - AL

19    Open    Complaint        14-07-ICE-0135 04/01/2014        04/28/2014        Short Form        (b)(6)
(b)(6)                        On April 1, 2014, CRCL received postal mail correspondence from(b)(6)
(b)(6)                        , an ICE detainee at Etowah County Jail in Gadsden, Alabama. In
correspondence dated March 24, 2014, Mr. (b)(6)        eports that despite requesting a high protein
diet, he is receiving meals high in carbohydrates and sugar, which cause his blood sugar levels to spike.
Mr. (b)(6)        writes, "I also take medication for high blood pressure and the food would be very salty
which causes both of my feet to swell up so large that I can not wear my shoes to do my exercise to
assist in the control of my blood sugar." He adds that he is currently on medication for damaged nerves
in his feet due to his diabetic condition.  Medical/Mental Health Care        Immigration detention  Etowah
County Jail    Gadsden        Alabama - AL

20    Open    Complaint        14-12-ICE-0448 09/11/2014        12/05/2014        Short Form        (b)(6)
(b)(6)                        On September 11, 2014, CRCL received postal mail from(b)(6)
(b)(6)        , an ICE detainee at Etowah County Jail in Gadsden, Alabama. Mr(b)(6)        writes that he is
receiving inadequate treatment for sickle cell anemia, and has experienced chronic pain since he arrived
at Etowah on 08/06/2014 . Mr.(b)(6)        states, "I am constantly having severe pain because I need [a]
blood transfusion to stop and prevent sickle cell crisis. Furthermore, I need my regular medication which
I take every day."    Medical/Mental Health Care    Immigration detention  Etowah County Jail
        Gadsden        Alabama - AL

21    Open    Complaint    15-02-ICE-0048 11/05/2014    01/12/2015    Short Form    (b)(6)
(b)(6)    On November 5, 2014, CRCL received email referral from DHS OIG (b)(7)(E)
regarding (b)(6)                                    a detainee at the Etowah County Detention Center in
Gadsden, Alabama. The complainant alleges that Deputy Officer (b)(6),(b)( harassed him because a sign
was placed in the cell for other detainees to keep-out; threatened with offensive language (his uncle is
the Warden and he officer (b)(6),(b) can do want ever he wants in the unit, including not wearing officers
uniforms); locked in his cell-room for 23 hours, and the SWAT team was summoned for intimidation
purposes. Complainant wants Officer (b)(6),(b)( o be investigated for not following the facility's protocols.
        Abuse of authority/misuse of official position    Immigration detention   Etowah County Jail
        Gadsden        Alabama - AL

22    Open    Complaint    15-02-ICE-0110 11/25/2014    12/19/2014    Short Form    (b)(6)
(b)(6)    On November 25, 2014, CRCL received an informal email referral from the DHS OIG
(b)(7)(E)    regarding (b)(6)                                an ICE detainee at Etowah County Jail in
Gadsden, Alabama. In a call to the OIG on November 21, 2014, Mr. (b)(6) alleges that his medication for
PTSD is not administered at the correct time. Specifically, he claims that when he doesn't receive it at
the correct time, his toxicity level becomes depleted, thereby leading him to experience severe mental
and emotional pain. Mr. (b)(6) claims that he receives his medication around the same time that he is
able to go to the law library to work on his immigration case, and this hinders his progress. Further, Mr.
(b)(6) reports that although he does not currently feel suicidal, he is concerned that he may feel that
way in the near future if this issue is not resolved.    Medical/Mental Health Care    Immigration
detention    Etowah County Jail        Gadsden        Alabama - AL

23    Open    Complaint    15-03-ICE-0122 12/05/2014    02/23/2015    Referred
Anonymous        On December 5, 2014, CRCL received an informal email referral from the DHS
OIG (b)(7)(E)    regarding an anonymous ICE detainee at Etowah County Jail in Gadsen, Alabama. In an
undated letter, the detainee makes several allegations about Officer (b)(6)        (b)(6),(b)(7)( including: 1)
he is racist and does not like Hispanics, (2) he threatens detainees with segregation, (3) he takes
detainees' food and commissary money; (4) he locks down the unit in order to get his hair cut, and (5)
he shows favoritism toward black detainees by allowing them to use the microwave and television
without restrictions.    Abuse of authority/misuse of official position    Immigration detention  Etowah
County Jail    Gadsden        Alabama - AL

24    Open    Complaint    15-03-ICE-0223 12/18/2014    03/26/2015    Short Form
        (b)(6)                            On December 18, 2014, CRCL received an informal email
referral from the DHS OIG (b)(7)(E)    regarding (b)(6)                            an ICE detainee
at Etowah County Jail in Gadsden, Alabama. In a letter dated November 26, 2014, Mr (b)(6) makes the
following allegations regarding medical care: (1) Inadequate medical care for headaches, blurry vision
with blackouts, back injuries that cause momentary paralysis, and injuries to his left shoulder as a result
of an accident that occurred when he exited a transport plane on February 10, 2014. He thinks that his
shoulder needs to be operated on.; (2) ICE allegedly failed to provide him his medication for his prostate
(b)(6)                for two days straight; and (3) He claims he suffered from pneumonia as a result of
not having adequate clothing.    Medical/Mental Health Care    Immigration detention  Etowah County
Jail    Gadsden        Alabama - AL

DHS-001-HQFO-00698-000126

25    Open    Complaint    15-06-ICE-0248 03/13/2015    03/25/2015    Back from Officer
    [(b)(6)]     "On March 13, 2015 CRCL received a phone call from [(b)(6)]
[(b)(6)]    an ICE detainee at Etowah County Jail, in Gadsen, Alabama.  Mr.
[(b)(6)] alleges that he was previously robbed, stabbed and taken to the hospital for an operation.  He
says that now that he is being detained at Etowah, he is not receiving any medical attention.


Mr. [(b)(6)] has an attorney named [(b)(6)] (phone number [(b)(6)] '    Medical/Mental Health
Care    Immigration detention    Etowah County Jail     Gadsden     Alabama - AL

26    Open    Complaint    15-06-ICE-0249 03/12/2015    03/26/2015    Short Form    [(b)(6)]
[(b)(6)]     On March 12, 2015 CRCL received an email referral from the DHS OIG
[(b)(7)(E)]    regarding [(b)(6)] , an ICE detainee at Etowah County Jail in Gadsen, Alabama.  In a
letter to the OIG received March 11, 2015, Mr.[(b)(6)] alleges that he was diagnosed with a hernia
at a previous facility however he has been denied surgery at Etowah.     Medical/Mental Health Care
    Immigration detention    Etowah County Jail     Gadsden     Alabama - AL

27    Open    Complaint    15-06-ICE-0328 03/31/2015    04/15/2015    Back from Officer
    [(b)(6)]     On March 31, 2015, CRCL received a telephone call from [(b)(6)]
[(b)(6)]    , an ICE detainee at Etowah County Jail in Gadsden, Alabama.
M[(b)(6)] stated that he is receiving inadequate medical care for pain in the back of his head for
11 days, and that the left side of his brain is numb. He alleged that he is being prescribed medication
without being seen by a physician.     Medical/Mental Health Care     Immigration detention    Etowah
County Jail     Gadsden     Alabama - AL

28    Open    Complaint    15-06-ICE-0330 03/30/2015    04/21/2015    Short Form    [(b)(6)]
[(b)(6)]     On March 30, 2015, CRCL received a telephone call from [(b)(6)]
[(b)(6)] , an ICE detainee at Etowah County Jail in Gadsden, Alabama. Mr.[(b)(6)] stated that he is suffering
from a painful hernia that requires surgery. He alleges he has been told by ICE that he has to see a
specialist, but he is in severe pain, and an appointment with a specialist has not been scheduled. He
claims he has submitted multiple sick call slips and his problems are not being addressed.
    Medical/Mental Health Care     Immigration detention    Etowah County Jail     Gadsden
    Alabama - AL

29    Open    Complaint    15-07-ICE-0359 04/03/2015    04/29/2015    Back from Officer
    [(b)(6)]     CRCL received postal mail correspondence from [(b)(6)]
[(b)(6)]    , an ICE detainee at Etowah County Detention Center, regarding. He
alleges that a correctional officer, a deputy named [(b)(6)(b)(7)(C)] harasses him about locking his door and
does not allow him enough time to lock it.  Mr. [(b)(6)] claims that [(b)(6)] has locked him in his
cell since March 22, 2015, giving him a 30-day lockdown during which he is allowed to leave his cell only
to shower. In addition, M[(b)(6)] tates that Officer[(b)(6)] has denied his requests for
cleansers such as soap and shampoo to use in the shower. Finally, he alleges that Officer[(b)(6)(b] arasses
and discriminates against "other [S]panish detainees" as well     Conditions of Detention Immigration
detention     Etowah County Jail     Gadsden     Alabama - AL